[No. E053095. Fourth Dist., Div. Two. Dec. 12, 2011.]

In re M.B., a Person Coming Under the Juvenile Court Law.
SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES,
Plaintiff and Respondent, v.
S.O., Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

\*Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of part IV.

COUNSEL

Roni Keller, under appointment by the Court of Appeal, for Defendant and Appellant.

Jean-Rene Basle, County Counsel, and Jeffrey L. Bryson, Deputy County Counsel, for Plaintiff and Respondent.

OPINION

**RICHLI, J.**—M.B. (the child), the infant son of S.O. (the mother), was detained, declared a dependent, and placed in foster care. Over the course of the dependency, the mother repeatedly yelled and cursed at employees of San Bernardino County Children and Family Services (the Department), including not only social workers, but also security guards and receptionists. She tied up the Department's phone lines with harassing and hangup calls. She also threatened employees of the Department; eventually, she pleaded guilty to one count of making a criminal threat. (Pen. Code, § 422.)

Shortly after the six-month review hearing, a therapist told the assigned social worker that the mother had threatened to shoot the social worker. In response, the Department applied for an injunction prohibiting the mother from contacting its employees, except through her counsel. The application was based in part on hearsay, including the therapist's statements, as set forth in a declaration by the social worker.

The juvenile court issued the requested injunction, although it allowed the mother not only to contact the Department through her counsel, but also to

contact her assigned social worker in writing or in response to a contact initiated by the social worker.

The mother appeals, contending:

1. The juvenile court did not have the authority to issue this type of injunction.

2. There was insufficient nonhearsay evidence to support the issuance of the injunction.

3. The injunction violates the mother's constitutional rights to due process and freedom of speech.

In the published portion of this opinion, we will hold that, even if the juvenile court lacked statutory authority, it had inherent authority to issue the injunction. We will further hold that, under Welfare and Institutions Code section 281, as construed in *In re Malinda S.* (1990) 51 Cal.3d 368 [272 Cal.Rptr. 787, 795 P.2d 1244], the hearsay contained in the social worker's declaration was admissible; this hearsay, when combined with the other evidence, was sufficient to support the injunction. In the nonpublished portion of this opinion, we will hold that the mother forfeited her constitutional claims by failing to raise them below. For this reason, we express no opinion on whether the injunction would have been equally appropriate if these claims had been raised.

We will affirm.

I

PROCEDURAL BACKGROUND

In February 2010, when the child was less than a year old, the Department detained him and filed a dependency petition concerning him.

In April 2010, the juvenile court sustained jurisdiction based on failure to protect. (Welf. & Inst. Code, § 300, subd. (b).) It formally removed the child from the parents' custody, and it ordered reunification services. In September 2010, however, the juvenile court suspended the mother's visitation, finding it "detrimental to the minor at this time." In January 2011, at the six-month review hearing, the juvenile court terminated the mother's reunification services (though not the father's). Her visitation remained suspended.

On February 25, 2011, the Department filed an application for an injunction against the mother, along with an application to shorten time. The trial court issued a temporary restraining order ex parte and granted the application to shorten time.

On March 4, 2011, after a hearing, the trial court issued an injunction. The injunction named as protected persons "[a]ll employees and staff" of the Department and also the family of social worker Pamela Keyes. It required the mother to stay at least 100 yards away from any protected person, from any protected person's home or vehicle, and from the Department offices. It also prohibited the mother from contacting any protected person, except as follows: (1) she could communicate with the Department through her court-appointed counsel; (2) she could communicate with her social worker in writing; and (3) she could communicate with her social worker if the social worker initiated the communication. The injunction was to remain in effect for three years.

## II

## THE JUVENILE COURT'S AUTHORITY TO ISSUE THE INJUNCTION

The mother contends that the juvenile court did not have the authority to issue the injunction.

■ We may assume, without deciding, that the injunction was not authorized under either Welfare and Institutions Code section 213.5[1] or Welfare and Institutions Code section 340.5.[2] Even if so, it was authorized under Code of Civil Procedure section 527.8, which allows an employer to obtain an injunction prohibiting "unlawful violence or threats of violence" against its employees. (Code Civ. Proc., § 527.8, subd. (f); see also *id.*, subd. (a).)

---

[1] Under Welfare and Institutions Code section 213.5, subdivision (a), in a dependency proceeding, the juvenile court can issue an order "(1) enjoining any person from molesting, attacking, striking, sexually assaulting, stalking, or battering the child or any other child in the household; (2) excluding any person from the dwelling of the person who has care, custody, and control of the child; . . . (3) enjoining any person from behavior, including contacting, threatening, or disturbing the peace of the child, that the court determines is necessary to effectuate orders under paragraph (1) or (2)"; or (4) "enjoining any person from contacting, threatening, molesting, attacking, striking, sexually assaulting, stalking, battering, or disturbing the peace of any parent, legal guardian, or current caretaker of the child . . . ." (See *id.*, subd. (d).)

[2] Under Welfare and Institutions Code section 340.5, subdivision (a), in a dependency proceeding, the juvenile court can issue an order "restraining the parents of the dependent child from threatening the social worker, or any member of the social worker's family, with physical harm."

Such an injunction can contain "stay away" and "no contact" provisions, if reasonably necessary to prevent future harm along the lines suggested by the defendant's past threats. For example, in *City of San Jose v. Garbett* (2010) 190 Cal.App.4th 526 [118 Cal.Rptr.3d 420], the trial court issued an injunction under Code of Civil Procedure section 527.8 ordering the defendant to stay 300 yards away from protected persons and from city hall, except during city council meetings; to use only specified entrances and staircases at city hall; to be subject to search before entering the city council chambers; and to file documents with the city clerk only by mail or through an intermediary, and not in person. (*City of San Jose*, at p. 536, fn. 2.) The appellate court held that these restrictions were not overbroad. (*Id.* at p. 545.)

The Judicial Council is authorized to develop forms for use in connection with Code of Civil Procedure section 527.8. (Code Civ. Proc., § 527.8, subd. (m).) The restraining order form that it has adopted allows for both "stay away" and "no contact" provisions. (Judicial Council forms, form WV-130, Restraining Order After Hearing to Stop Workplace Violence.) The Judicial Council's interpretation of the permissible scope of an injunction under Code of Civil Procedure section 527.8 is not binding on us, but it is highly persuasive. (See *Sara M. v. Superior Court* (2005) 36 Cal.4th 998, 1011–1012 [32 Cal.Rptr.3d 89, 116 P.3d 550].)

Code of Civil Procedure section 527.8 can apply in a dependency case. "A line of older intermediate appellate decisions seems to suggest . . . Code of Civil Procedure requirements do not apply to a juvenile dependency case unless the Welfare and Institutions Code so provides. [Citations.]" (*In re R.H.* (2009) 170 Cal.App.4th 678, 696–697 [88 Cal.Rptr.3d 650].) However, "[t]he 'better view is that application of a statute outside the Welfare and Institutions Code (and not expressly made applicable) is *not* necessarily barred from dependency proceedings. Courts should determine whether the statute at issue is consistent with the overall purposes of the dependency system.' [Citation.]" (*Id.* at p. 697 [vexatious litigant statutes, Code Civ. Proc., § 391 et seq., apply in dependency proceedings]; see also *In re Claudia E.* (2008) 163 Cal.App.4th 627, 636 [77 Cal.Rptr.3d 722] [declaratory relief statute, Code Civ. Proc., § 1060, applies in dependency proceedings]; *In re Mark B.* (2007) 149 Cal.App.4th 61, 65, 74–80 [56 Cal.Rptr.3d 697] [sanctions statute, Code Civ. Proc., § 128.7, applies in dependency proceedings].)

"The juvenile court is a special department of the superior court whose powers are limited to those granted by the Juvenile Court Law [citation] plus those incidental thereto. [Citations.] Under the Juvenile Court Law, the juvenile court is authorized to make orders pertaining to abused or neglected children who come within the court's jurisdiction. [Citations.]"

(*In re Ashley M.* (2003) 114 Cal.App.4th 1, 6–7 [7 Cal.Rptr.3d 237], fn. omitted.) An order preventing a parent from harassing the social services agency and its employees is reasonably pertinent to the protection of the child. Admittedly, the agency could just file a petition for an injunction in a different department of the superior court. However, the juvenile court is in a better position to fine tune the injunction to the legitimate needs of the parent and the agency, as well as the child. The parent is also better off, because, if indigent, he or she has a right to a court-appointed lawyer. (Welf. & Inst. Code, § 317.) Thus, Code of Civil Procedure section 527.8, at least as applied in this case, is not merely consistent with but affirmatively furthers the overall purposes of the dependency system.

■ Even if Code of Civil Procedure section 527.8 did not exist, however, the juvenile court would still have inherent power to issue an injunction like the one in this case. "All courts have inherent powers which enable them to carry out their duties and ensure the orderly administration of justice. The inherent powers of courts are derived from article VI, section 1 of the California Constitution and are not dependent on statute. [Citations.]" (*In re Amber S.* (1993) 15 Cal.App.4th 1260, 1264 [19 Cal.Rptr.2d 404].)

For example, in *Hernandez v. Vitamin Shoppe Industries Inc.* (2009) 174 Cal.App.4th 1441 [95 Cal.Rptr.3d 734], when the lead plaintiff in a class action was about to settle, her attorney wrote to other class members, urging them to opt out and to retain him to represent them in a separate class action asserting the same claims against the same defendant. (*Id.* at pp. 1444–1447.) The trial court ordered him not to communicate with such class members. (*Id.* at pp. 1448–1449.) The appellate court sustained the order. It explained, "[A]ll courts possess inherent supervisory or administrative powers to enable them to carry out their duties, albeit subject to certain limitations. [Citation.] In a class action, a trial court has the authority and the duty 'to protect the rights of all parties, and to prevent abuses which might undermine the proper administration of justice.' [Citation.] Where a trial court identifies a potential for abuse, the court ' "has both the duty and the broad authority to exercise control over a class action and to enter appropriate orders governing the conduct of counsel" ' and parties. [Citation.]" (*Id.* at p. 1454.)

■ In a dependency, no less than in a class action, the court has the inherent authority to prevent abuses that could undermine the proper administration of justice. "[I]n performing some functions in juvenile dependency cases the social services agency serves as an 'arm of the court.' [Citations.]" (*In re Ashley M., supra,* 114 Cal.App.4th at p. 8.) The agency's proper performance of its duties is essential to the protection of the child. Assuming that the mother was threatening employees of the Department so as to intimidate them and prevent them from carrying out their duties, the juvenile court had not only the authority but also the duty to intervene.

## III

### THE SUFFICIENCY OF THE EVIDENCE TO SUPPORT THE INJUNCTION

The mother contends that there was insufficient evidence to support the injunction, particularly once hearsay evidence, to which she objected below, is disregarded.

#### A. *Additional Factual Background.*

Along with its application, the Department filed declarations by two of its employees.

##### 1. *Declaration of Jean Texera.*

Jean Texera was a child welfare services manager. She testified that, on February 25, 2010, the mother was told that her visitation was suspended. The mother then caused a disturbance in the lobby of the Department's offices at the Carousel Mall, yelling and cursing at a social worker.

Texera met with the mother in a visitation room, accompanied by a security guard and a police officer. The mother "began yelling and screaming obscenities at [Texera] and at [the] security guard." "She also made threatening and offensive statements and movements toward the security guard." Texera was afraid that the mother was going to hit her. When the mother "would not calm down and continued to shout obscenities," Texera terminated the meeting. At first, the mother refused to leave, but eventually, "[t]he guards were . . . able to get her out of the building."

##### 2. *Declaration of Pamela Keyes.*

###### a. *Matters that Keyes testified to based on personal knowledge.*

Pamela Keyes was the social worker assigned to the case. She testified to the following matters that she had personally observed.

During a visit in March 2010, Keyes told the mother that the child seemed to be having some hearing problems, and he was going to be tested. He was sleeping; the mother made noises with rattles and toys close to his head and snapped her fingers near his ears. When he did not wake up, she became very upset. She accused the foster parent of making the child deaf. At the end of the visit, she began "yelling and screaming . . . profanities" at Keyes. A

security guard told her to leave the office, but she began cursing at him and repeating, "[Y]ou can't make me fucking leave." In Keyes's opinion, "it was clear [the mother]'s behavior was escalating toward the potential for physical violence . . . ." The police were called, and they arrested the mother.

In April 2010, during a phone call with Keyes, the mother said, "I know a lot of people get physical with you all." As she kept talking about what other people do, Keyes asked if she was referring to what she intended to do. The mother replied, "I don't talk about my intentions, I just do them."

In May 2010, during a phone call, the mother said she did not want Keyes to be at a certain upcoming meeting, because "something bad will happen."

In December 2010, prior to a scheduled meeting, the mother told Keyes, "[Y]ou better have the police on stand-by."

b. *Matters that Keyes testified to based on hearsay.*

Keyes also testified to the following matters, all of which had been reported to her by others, including police officers, the Department receptionists, and other social workers.

In February 2010, when the mother was first informed that the Department was going to detain the child, she yelled and cursed in the lobby of the Department's offices, preventing the conduct of business. She did not calm down until the police arrived.

When the child was in fact detained, the mother yelled and cursed at the social worker, despite the presence of police officers. She also "lunged" at the social worker, leading the officers to physically separate them.

On February 23, 2010, during a supervised visit, the mother called one social worker a "fuck'n bitch" and a "damn motherfucker"; she added, "[F]uck you, bitch."

On February 26, 2010, the juvenile court suspended the mother's visitation. After the hearing, she refused to leave the courtroom. A bailiff escorted her out, but when she continued to shout and argue, he arrested her. He released her several hours later.

In April 2010, the mother hung up on two receptionists and called one of them a "stupid bitch." The next day, she phoned the Department about 30 times, "making harassing, prank phone calls." The day after that, she continued to call repeatedly, tying up the phone lines and "direct[ing]

profanity at staff . . . ." Later in April, when she renewed this behavior, she was charged with making annoying telephone calls. (Pen. Code, § 653m.)[3]

Also in April, at the Department's offices, when the mother saw a particular social worker, she "flipped [the social worker] off and she directed profanity at [the social worker]."

In May 2010, the mother phoned and said she was on her way "to fuck all you bitches up." The police were called. When she arrived, security guards prevented her from entering the building, but she threatened two social workers, saying she would kill them and their "offspring."

Two days later, the mother started making harassing phone calls again. As a result, a police officer went to her home. The officer either made or obtained a tape recording of the mother making threats against Keyes "and the entire [c]ounty." The officer arrested the mother and charged her with making criminal threats. On May 17, 2010, she pleaded guilty to making criminal threats, as a misdemeanor. She was sentenced to 90 days in jail. As a condition of probation, she was ordered to stay away from receptionist April Whitfield and social worker Courtney Roushion. She was also ordered not to "make phone calls to the Department . . . unless they call first" or "unless for a lawful [purpose]."

In December 2010, the mother made unspecified threats to receptionist Whitfield. She also "engaged in some stalking behavior" near a bus stop that Whitfield used.

Most recently, on February 24, 2011, the mother told a therapist, Natalie Haghani, that if the father got custody, she was going to shoot Keyes at the Department's offices. Alternatively, if the father did not get custody, she had a plan for sneaking a gun into court, and she was going to use it to shoot Keyes, the judge, and everyone else in the courtroom. As a result, the mother was arrested and charged with making criminal threats.[4]

### 3. *Documentary evidence.*

At the hearing, counsel for the Department introduced two registers of actions, one from the May 2010 case in which the mother had pleaded guilty

---

[3] The record does not reveal the disposition of this case.

[4] We take judicial notice that in May 2011, a jury found the mother not guilty.

Indeed, it would appear that she *was* not guilty of this crime, because she made the threats to Haghani, not to Keyes or any of the other subjects of the threats, and she most likely did not intend Haghani—a therapist—to convey them to anyone else. (See *People v. Felix* (2001) 92 Cal.App.4th 905, 913–915 [112 Cal.Rptr.2d 311].)

to making a criminal threat and one from the then pending case in which she was charged with making a criminal threat. He also introduced a letter from therapist Haghani regarding the mother's recent threat to shoot Keyes.

### B. *Additional Procedural Background.*

The mother did not file any written opposition to the Department's application, nor did she offer any evidence. At the hearing on the application, however, her counsel objected to Keyes's testimony about matters that she had learned from others, as hearsay. He also objected to the letter from Haghani as hearsay. He then argued that the matters to which Keyes had testified based on personal knowledge were stale, having occurred a year or so earlier, and did not involve any "direct threats toward [Keyes]." He pointed out that Texera's declaration also related to an incident that had occurred over a year earlier.

Counsel for the Department argued that the juvenile court was authorized to issue an injunction under Welfare and Institutions Code section 213.5 based on hearsay. Alternatively, however, he argued that there was sufficient nonhearsay evidence to support an injunction, and that therapist Haghani's hearsay statements regarding the mother's most recent threats could be considered as evidence that Keyes was reasonably in fear.

The mother's counsel did not object to the two registers of actions, and the trial court admitted them.

The trial court agreed that much of Keyes's testimony was inadmissible hearsay. It ruled, however, that it would issue an injunction, in light of (1) "Ms. Keyes['s] personal knowledge of the history with [the mother]," (2) the mother's prior conviction for making criminal threats in May 2010, and (3) "what Ms. Keyes was told by Ms. Haghani," although only to show the basis for Keyes's fear.[5]

---

[5] Attached to the Department's application, there were four earlier social worker's reports, filed between February and April 2010. The mother's counsel never objected to them. Thus, they were properly in evidence.

Nevertheless, we disregard them, for four reasons. First, from the trial court's ruling, it appears that it did not consider them. Second, much of the same information was contained, albeit in hearsay form, in Keyes's declaration. Third, these reports, standing alone, would have been insufficient to support the injunction, because they related to the mother's conduct approximately a year before the injunction hearing. "The 'purpose of a prohibitory injunction is to prevent future harm to the applicant by ordering the defendant to refrain from doing a particular act. [Citations.] Consequently, injunctive relief lies only to prevent threatened injury and has no application to wrongs that have been completed. [Citation.] It should neither serve as punishment for past acts, *nor be exercised in the absence of any evidence establishing the*

C. *Analysis.*

The majority of Keyes's declaration was hearsay and not within any exception set forth in the Evidence Code. So was Haghani's letter. The Department does not argue otherwise.

■ There is an exception to the hearsay rule, however, that applies solely in dependency proceedings. In *In re Malinda S., supra,* 51 Cal.3d 368, the California Supreme Court held that, at least at a jurisdictional hearing, hearsay contained in a social worker's report is admissible, provided the social worker is available to be cross-examined, on the request of a parent.

■ The court relied on Welfare and Institutions Code section 281 (section 281), which, as it noted, provides: ". . . 'The [social worker][6] shall upon order of any court in any matter involving the custody, status, or welfare of a minor or minors, make an investigation of appropriate facts and circumstances and prepare and file with the court written reports and written recommendations in reference to such matters. *The court is authorized to receive and consider the reports* and recommendations of the [social worker] in determining any such matter.' " (*In re Malinda S., supra,* 51 Cal.3d at p. 376.) It observed that "section 281 is quite broad," as it applies " 'in *any* matter involving the *custody, status* or *welfare* of a minor,' " and it authorizes the court to consider the reports " 'in determining *any such matter.*' " (*Id.* at pp. 378–379.) Based on various indicia of legislative intent, it concluded that section 281 was intended to "to create a hearsay exception for social studies . . . ." (*Malinda S.,* at p. 379; see also *id.* at pp. 376–381.) The court also held that hearsay in a social worker's report can be sufficient to support a jurisdictional finding. (*Id.* at pp. 381–382.)

At the time, as the court also noted, former rule 1450(c) of the California Rules of Court provided that a social worker's report was admissible only if the authoring social worker was available for cross-examination, on request. (*In re Malinda S., supra,* 51 Cal.3d at p. 378.) The court held that this was sufficient to protect the parent's due process rights; if a parent wanted to cross-examine a declarant whose hearsay was contained in the reports, it was up to the parent to subpoena the declarant. (*Id.* at pp. 382–385.)

---

*reasonable probability the acts will be repeated in the future.'* [Citation.]" (*Huntingdon Life Sciences, Inc. v. Stop Huntingdon Animal Cruelty USA, Inc.* (2005) 129 Cal.App.4th 1228, 1266 [29 Cal.Rptr.3d 521].)

Fourth—and most important—we will conclude that there was sufficient evidence to support the injunction, even in the absence of the reports.

[6] Section 281 actually refers to "[t]he probation officer." However, Welfare and Institutions Code section 215 provides: "As used in this chapter, unless otherwise specifically provided, the term 'probation officer' . . . shall include . . . any social worker in a county welfare department . . . ."

*In re Corey A.* (1991) 227 Cal.App.3d 339 [277 Cal.Rptr. 782] extended *Malinda S.* to a dispositional hearing. As it noted, Welfare and Institutions Code section 358 (section 358) provides that, at a dispositional hearing, " 'the court shall receive in evidence the social study of the minor made by the probation officer, any study or evaluation made by a child advocate appointed by the court, and such other relevant and material evidence as may be offered.' " (*Corey A.*, at p. 347.) It construed this to mean that "any relevant evidence including hearsay shall be admitted . . . ." (*Ibid.*) Moreover, it held that, unlike at the jurisdictional hearing, there was no statute or rule requiring that the preparer of the report be made available for cross-examination at the dispositional hearing. (*Id.* at pp. 347–348.)

*In re Keyonie R.* (1996) 42 Cal.App.4th 1569, 50 Cal.Rptr.2d 221 further extended *Malinda S.* to a 12-month review hearing. It reasoned that "[t]he language of section 281 broadly authorizes the trial court to receive and consider social service reports in determining '*any matter involving the custody, status, or welfare of a minor.*' " (*Keyonie R.*, at p. 1572.) It also noted that subdivision (f) of Welfare and Institutions Code section 366.21 (section 366.21), governing the 12-month review hearing, required the court to "review" the social worker's report. (*Keyonie R.*, at p. 1572.)

After these cases were decided, Welfare and Institutions Code section 355 (section 355) was amended to adopt one holding in *Malinda S.* (that hearsay in a social worker's report is admissible), but to reject another (that such hearsay is sufficient to support a jurisdictional finding). (Stats. 1996, ch. 36, § 1, pp. 144–146; see also *In re Cindy L.* (1997) 17 Cal.4th 15, 22, fn. 3 [69 Cal.Rptr.2d 803, 947 P.2d 1340].) Thus, section 355, subdivision (b) now provides that, at a jurisdictional hearing, hearsay contained in a social worker's report is admissible, provided the preparer of the report is made available, on request, for cross-examination. Section 355, subdivision (c), however, goes on to provide that, subject to exceptions that we need not go into here, if a party objects to specific hearsay contained in a social worker's report, that hearsay is not sufficient, by itself, to support a jurisdictional finding.

██ So would hearsay in a social worker's report be admissible to support an injunction in a dependency? Unlike at a jurisdictional hearing (§ 355), a dispositional hearing (§ 358), or a 12-month review hearing (§ 366.21, subd. (f)), there is no specific statute that requires the juvenile court to consider a social worker's report in connection with an application for an injunction. Indeed, in part II, *ante*, we questioned whether there is any statutory authorization at all for the injunction in this case. Nevertheless, section 281 authorizes the juvenile court to consider a social worker's report in determining "any matter involving the custody, status, or welfare of a

minor . . . ." As the court noted in *Malinda S.*, this language is very broad. It is now generally understood to authorize the admission of a social worker's report—including hearsay in the report—in *any* dependency proceeding. (See, e.g., *In re Jonique W.* (1994) 26 Cal.App.4th 685, 698 [31 Cal.Rptr.2d 601] ["[g]enerally speaking," a social worker's report containing hearsay "is competent and admissible proof in a dependency proceeding"].)

Even if we were to focus on the narrow purpose of the injunction hearing, we would come to the same conclusion. The Department was seeking an injunction to prevent the mother from intimidating its employees and interfering with their performance of their duties to supervise the dependency. Thus, the application required the juvenile court to determine a "matter involving the . . . welfare of a minor."

■■■ The mother argues, however, that the hearsay was contained in a declaration, not in a social worker's report. Under the circumstances of this case, however, this is a distinction without a difference. Section 281 directs the social worker to "make an investigation of appropriate facts and circumstances and prepare and file with the court written reports . . . in reference to such matters." It does not define "report."[7] Here, Keyes was the social worker assigned to the case. Her declaration was in writing and filed with the court; it recounted the results of her investigation of the relevant facts and circumstances. Hence, it was a "report" within the meaning of section 281.

*In re Stacy T.* (1997) 52 Cal.App.4th 1415 [61 Cal.Rptr.2d 319] supports our conclusion. There, social worker Zimmerer filed a report that attached "fact sheets" (*id.* at p. 1418) by social workers Lipschutz and Flynn. (*Id.* at p. 1420.) At the jurisdictional hearing, Zimmerer was present and available for cross-examination. The trial court denied the mother's counsel's request for an opportunity to cross-examine Lipschutz and Flynn. (*Id.* at pp. 1420–1421.) The appellate court held that the "fact sheets" were reports within the meaning of section 281, and therefore the juvenile court erred by denying the mother's counsel's request. "These fact sheets . . . are reports prepared by the social workers assigned to the minor at the pertinent times. They are 'written reports and written recommendations' concerning the custody, status and welfare of a minor, made after "investigation of the

---

[7] Section 355, which applies solely to the jurisdictional hearing, makes hearsay admissible if it is in a "written report furnished to the juvenile court and to all parties or their counsel by the county probation or welfare department in any matter involving the custody, status, or welfare of a minor in a dependency proceeding . . . ." (§ 355, subd. (b)(1).) This definition would encompass Keyes's declaration. Although it did not apply here of its own force, it is persuasive authority. (*Dieckmann v. Superior Court* (1985) 175 Cal.App.3d 345, 356 [220 Cal.Rptr. 602] ["Where the same term or phrase is used in a similar manner in two related statutes concerning the same subject, the same meaning should be attributed to the term in both statutes unless countervailing indications require otherwise."].)

appropriate facts and circumstances[.]' [Citation.] They contained 'information relevant to the jurisdiction hearing.' [Citation.] Additionally, they are reports that the court received and considered . . . ." (*Stacy T.*, at p. 1425.) For similar reasons, Keyes's declaration here was a "report" under section 281.

Under *Corey A.*, the requirement that the preparer of the report be made available for cross-examination, on request, applies only at the jurisdictional hearing. It did not apply at the injunction hearing here. Nevertheless, Keyes was, in fact, present at the hearing. The mother's counsel, however, did not ask to cross-examine her (nor to cross-examine any of the declarants whose hearsay was in Keyes's declaration).

Similarly, the limitation that hearsay in a social worker's report is insufficient to support a finding, set forth in section 355, applies only at a jurisdictional hearing. It did not apply at the injunction hearing here. Thus, the juvenile court was free to issue an injunction based, in whole or in part, on the hearsay in Keyes's declaration.

Once the hearsay evidence is considered together with the nonhearsay evidence, it is clear that there was sufficient evidence to support the injunction. The mother was seething with anger at the Department, and she had a serious problem with impulse control. This led her to carry out a pattern of hostile and threatening behavior. In February through May 2010, it took the form of yelling, screaming obscenities, making harassing phone calls that obstructed Department business, and physically obstructing Department offices. In one incident, in May 2010, the mother threatened "to fuck all you bitches up" and to kill two particular social workers and their children.

Admittedly, in the wake of her May 2010 conviction for making criminal threats (which included a sentence of 90 days in jail), there was a lull. In December 2010, however, the mother resumed her hostile and threatening behavior. She threatened Keyes, saying, "[Y]ou better have the police on stand-by." She also threatened and "engaged in . . . stalking behavior" toward Whitfield. This was of particular concern, as it apparently violated one of the conditions of her probation, which was that she stay away from Whitfield.

Finally, on February 24, 2011, the mother revealed to Haghani her intent to shoot Keyes. She even had a plan to sneak a gun into court and to use it to shoot Keyes, the judge, and everyone else in the courtroom. This was more than ample evidence that she posed an imminent threat to the Department and its employees, justifying an injunction.

## IV

## VIOLATION OF THE MOTHER'S CONSTITUTIONAL RIGHTS[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## V

## DISPOSITION

The order appealed from is affirmed.

Ramirez, P. J., and Hollenhorst, J., concurred.

---

[*]See footnote, *ante*, page 1057.