Filed 1/21/14  In re Clarissa R. CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re CLARISSA R. et al., Persons Coming Under the Juvenile Court Law. | |
| ORANGE COUNTY SOCIAL SERVICES AGENCY,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>ELIZABETH C.,<br><br>    Defendant and Appellant;<br><br>ANTONIO R.,<br><br>    Respondent. | G048455<br><br>(Super. Ct. Nos. DP023320 & DP023321)<br><br>O P I N I O N |

Appeal from an order of the Superior Court of Orange County, Dennis J. Keough, Judge.  Affirmed.

Kathleen Murphy Mallinger, under appointment by the Court of Appeal, for Defendant and Appellant.

Nicholas S. Chrisos, County Counsel, Karen L. Christensen and Jeannie Su, Deputy County Counsel, for Plaintiff and Respondent.

Jesse McGowan, under appointment by the Court of Appeal, for Respondent.

*          *          *

Elizabeth C. (mother) and Antonio R. (father) are the unmarried parents of two minor daughters, Clarissa R. and Madeline R., now 11 and 7 years old respectively. The juvenile court denied mother's request for a renewed restraining order against father under Welfare and Institutions Code section 213.5 (all further undesignated statutory references are to this code) but issued a stay-away order. Mother contends the court had no authority to issue a stay-away order and that the evidence supported the granting of the renewed restraining order. She also asserts the court erred in ordering her to participate in parenting and anger management programs. We disagree and affirm the order.

## FACTS AND PROCEDURAL BACKGROUND

Mother and father had a tumultuous on-again, off-again relationship for about 11 years, with father subjecting mother to intermittent bouts of physical and verbal abuse. In April 2009, mother obtained a temporary restraining order (TRO) against father. Several months later, the court dismissed the order to show cause (OSC) without prejudice and ordered father to stay away from mother's home and place of employment and for both not to make derogatory comments about each other in front of the children. Parents reconciled in December 2010 and mutually agreed to dissolve the restraining order.

In April 2012, father twisted mother's arm and mother threw a sandwich in father's face; both parties called the police. The responding officer recommended mother

2

leave the house because her actions constituted battery and if each party pressed charges against the other the children would be taken into protective custody. Mother took the children and left the house. The next day, she moved for child support. Concurrently, father moved to remove mother from the house. When father's request was denied two days later, he filed a request for a TRO against mother. Mother filed a response, asking the court to reinstate the 2009 order and modify the custody and visitation orders.

The court denied father's request for a TRO because the parties had already physically separated, and set a hearing date for the OSC on the restraining order. On the date of the hearing, father received notice that a criminal and child abuse report had been made against him based on an incident a few days before in which he, upset upon receiving notice of the hearing on mother's request for child support, "cornered Clarissa in the bedroom," "waved the court papers in her face and angrily told her not to tell the court . . . about . . . [his] . . . past aggressive behavior[ or] . . . he would lose his job [as a sheriff's deputy] and they would lose the house."

In early June, the court authorized the temporary removal of the children from father's custody. About a week later, the Los Angeles County Department of Children and Family Services (DCFS) filed a section 300 petition, alleging parents had a history of domestic violence and father abused alcohol. At the detention hearing, the court detained the children from father but authorized monitored visits and left them in mother's custody. The report prepared for the hearing indicated mother and the children were residing at a confidential address and that father had continued to ask the children of mother's whereabouts. The court granted mother's request to reinstate the TRO and issued successive TROs, expiring on the scheduled date for the jurisdiction hearing.

At the combined jurisdiction and disposition hearing in October, the court sustained an amended petition after both parents pleaded no contest to allegations describing their long history of physical and verbal altercations in front of the children. The court placed the children with mother and ordered supervised visits for father. Case

3

plans for both parents included domestic violence counseling, conjoint counseling with the children on alternating weeks, and individual counseling dealing with, among other things, the effects of their conflict on the children. Father was also ordered to participate in an anger management program. At a subsequent hearing that month, the court issued a 90-day restraining order against father.

In November 2012, mother and the children moved to Orange County and the case was transferred there. Prior to the transfer, the court issued an OSC regarding father's failure to return property belonging to mother and the children, stating it had "tried to be reasonable before with respect to the restraining order because [it] didn't want it to interfere or jeopardize [father's] job, but this has gone too far[, as he] is putting his child at risk now" by failing to return a breathe nebulizer needed by Madeline. At the OSC hearing, the judge ordered father to go home and make the essential items available. Father complied and once that was verified, the case was transferred to the Orange County Superior Court.

In January 2013, that court issued a TRO against father and extended it until the completion of the six-month review hearing scheduled for April. At the combined hearing for the six-month review and the OSC on the restraining order in April, which took place over several days, the court admitted into evidence two six-month review reports, took judicial notice of transcripts from the Los Angeles Superior Court, and heard testimony from several witnesses.

In the reports a social worker observed the children were happy in mother's care but missed father, as he had not visited after the case was transferred to Orange County. Father denied the domestic violence allegations, claiming instead that he was the victim of domestic violence by mother when she threw the sandwich at him, and did not participate in the services because Orange County Social Services Agency (SSA) had not cooperated with him.

4

According to Clarissa's therapist, Clarissa blamed herself for her parents' separation, the dependency case, and loss of home. Additionally, father had asked Clarissa not to talk to SSA and the court, and at the December 2012 hearing father had scared her by inquiring "about her current whereabouts."

Mother strongly urged the court to extend the current restraining order due to her continued fear of father. According to the social worker, mother believed father was "not being held accountable for" his domestic violence because "he, his brother, and friends are all in law enforcement," which frustrated her. The prosecutor had told her "there was no 'hard evidence'" and that the case would not be prosecuted. Although the prosecutor indicated she would urge internal affairs to discipline him, mother doubted that would occur, because "the officers and his deputy friends would continue to cover for him." Mother's therapist conveyed that "mother is focused on 'proving the allegations' and holding the father accountable," staying "up to three in the morning completing research," but would continue working with mother to keep her focused on herself and the children. Mother's case manager likewise indicated she would continue helping mother "'work through'" her "apparent anger."

The social worker reported mother also expended much time and energy in having her and the children's personal property returned despite being told her main efforts should be their "safety and well being." Additionally, the social worker repeatedly asked mother to initiate phone calls between father and the children, but she never did.

The social worker initially recommended extending the restraining order given father's denial of the allegations, refusal to participate in services, history of physically and emotionally abusing mother, and attempt to dissuade Clarissa from reporting such acts. Without a restraining order, the social worker believed the parents would continue fighting and allowing them to have contact with each other "would escalate into renewed physical violence" by father against mother. The social worker

5

acknowledged a stay-away order could be appropriate, but believed a restraining order was "more encompassing or restrictive, more direct" and would provide "a higher level of safety and security for . . . mother." The social worker conceded father had not violated the restraining order since the case had been transferred to Orange County and had not physically harmed mother or threatened to do so after he was assigned to the case.

Mother testified she reported several of the domestic violence incidents to father's parents. She also told father's supervisors about a March 2009 incident in which father verbally abused her and "said he wanted [her] to die." She went to father's supervisors instead of the local police station because she "didn't know where to go" and "wanted to report to his . . . commanding officers first." Mother described another incident to father's partner and good friend, as opposed to a neutral person because "[t]hey all lived far away" and she had reported other instances to him. She acknowledged that since the restraining order issued by the Los Angeles Superior Court in October 2012, father had not threatened her, tried to contact her directly, or appeared at her home or work place, although she believed he violated the restraining order at the December court hearing by asking Clarissa where she lived. That scared her because father's skills and employment would enable him to find her and she believed he knew where she lived. Mother moved to Orange County to get a fair trial because she believed the Los Angeles County Family and Juvenile Courts were lenient and biased toward father. Mother did not feel safe after moving to Orange County; she "still live[d] in fear" of father and would fear him regardless of what the court ordered. She wanted a restraining order "to be protected" and so that father would not have access to weapons even though she would still be afraid.

Father invoked his Fifth Amendment right not to answer questions about the parties' history of domestic violence and the claim he had asked of mother's whereabouts at the December 2012 hearing. He testified he was not willing to participate

6

in a domestic violence program because he had "a difficult time participating in" a program for something he did not commit, but was willing to participate in a parenting program. Although he acknowledged the ongoing dispute with mother about returning the children's property, he claimed he had already complied. The paternal grandfather testified that he was sitting a few feet from father outside the courtroom at the December hearing when Clarissa came over to talk to father and father never asked where she lived.

At the close of evidence SSA changed its position, arguing mother could not have "reasonable fear . . . or apprehension because when they are not together, there's no harm." A restraining order made no sense when father and mother do not contact each other when separated. Although father needed his gun for his employment, SSA emphasized it did not take that into consideration in arguing "for simply a stay-away order."

The court vacated the last TRO and denied the request to extend the restraining order because it found no showing of "reasonable apprehension of future harm" or that a likelihood of future domestic violence. It noted there was no domestic violence when the parties were physically separated or any indication father used the resources of his job to locate where mother and the children lived. The evidence about whether father tried to obtain the address from Clarissa was conflicting, although whatever was said scared Clarissa. The court believed mother may have been motivated to strike back at father by interfering with his ability to work at a job that was clearly important to him by making him unable to carry a weapon. It noted mother repeatedly attacked father's image by complaining to his supervisors, colleagues, partners, and parents, rather than to someone who could be more effective.

The court issued a stay-away order instead, protecting mother only, instructing father not to have any direct or indirect contact with mother or to conduct or have others conduct a search for where mother and the children lived. It also directed mother to contact the appropriate authorities should any violation of the court's order or

7

criminal activity occur. If father violated the stay-away order, the court noted mother knows "the way to the appropriate policing authorities and [how] to request a family law restraining order" and warned father that any such violation "could have the consequences that would attach to a violation of a court order."

The court left the children in mother's custody under a family maintenance plan and authorized three hours of weekly monitored visitation for father. It ordered both parents to participate in parenting and anger management programs given the discord between them and the troubling display of anger in court, stating "this is not something the court orders to the benefit of one spouse over the other, but to the benefit of each party particularly in relationship to their children."

DISCUSSION

*1. Jurisdiction to Issue Stay-Away Order*

Mother argues the court did not have authority as a matter of law to issue a stay-away order because, despite the court's inherent power to hold parties for violation of its orders, it had no power "to hold parties in contempt when they violate a domestic stay-away order[.]" Following our de novo review, we disagree.

Mother relies on *In re Nolan W.* (2009) 45 Cal.4th 1217, 1224 (*Nolan*), which held "the juvenile court may not use its contempt power to incarcerate a parent solely for the failure to satisfy aspects of a voluntary reunification case plan." *Nolan* reasoned that a "court's power to compel compliance with its orders to ensure the orderly administration of justice does not extend to punishing violations of substantive law when such violations do not impair the dignity or functioning of the court. When the Legislature has established a specific penalty for a transgression, courts may not impose a contempt punishment that is inconsistent with the legislative scheme." (*Id*. at p. 1231.) A parent's participation in a reunification plan is voluntary and, under the statutory

8

scheme governing juvenile dependency, "the Legislature envisions the punishment for noncompliance with reunification services to be loss of those services and, ultimately, loss of parental rights." (*Id*. at p. 1235.)

*Nolan* is inapposite. Assuming without deciding the court in this case was relying on its power to hold parties in contempt as mother asserts, it was not threatening to imprison father for noncompliance with his voluntary reunification plan. Unlike in *Nolan*, compliance with the stay-away order was not voluntary and a violation of it would impair the court's dignity and functioning as it would allow parties to disregard its orders with impunity. Further, mother has cited no statute that would govern noncompliance with the stay-away order.

By contrast, as *Nolan* noted, courts have "inherent power to enforce compliance with its lawful orders through contempt." (*Nolan*, *supra*, 45 Cal.4th at p. 1230; § 350, subd. (a)(1).) And a juvenile court, like other courts, has "'inherent powers which enable [it] to carry out [its] duties and ensure the orderly administration of justice,'" including the ability to issue an order containing a stay-away provision to protect against violence by a parent. (*In re M.B.* (2011) 201 Cal.App.4th 1057, 1064 [juvenile court may prevent violence by a parent against a social worker under statute allowing employers to protect their employees, as well as under its inherent power to issue injunction].) "In a dependency [action] . . . the court has the inherent authority to prevent abuses that could undermine the proper administration of justice." (*Ibid*.)

Mother maintains *In re M.B., supra,* 201 Cal.App.4th 1057 does not apply because the court's inherent power only applies if the remedy is not covered by a specific statute and here it was governed by section 213.5, which authorizes the Domestic Violence Protection Act (DVPA; Fam. Code, § 6200 et seq.) to apply to dependency proceedings. She relies on the provision of section 213.5, subdivision (a) providing that "[a] court *may* also issue an ex parte order enjoining any person from molesting, attacking, striking, stalking, threatening, sexually assaulting, battering, harassing,

9

telephoning, including, but not limited to, making annoying telephone calls as described in Section 653m of the Penal Code, destroying the personal property, contacting, either directly or indirectly, by mail or otherwise, coming within a specified distance of, or disturbing the peace of any parent . . . upon application in the manner provided by Section 527 of the Code of Civil Procedure or, if related to domestic violence, in the manner provided by Section 6300 of the Family Code." (Italics added.) She also quotes section 213.5, subdivision (d)(1): "The juvenile court *may* issue, upon notice and a hearing, any of the orders set forth in subdivisions (a), (b), and (c). Any restraining order granted pursuant to this subdivision shall remain in effect, in the discretion of the court, no more than three years, unless otherwise terminated by the court, extended by mutual consent of all parties to the restraining order, or extended by further order of the court on the motion of any party to the restraining order." (Italics added.) Based on these two provisions, mother contends the court was required to renew the restraining order under the DVPA, in particular Family Code section 6345. The argument lacks merit.

Nothing in either subdivision mandates that a juvenile court must or shall utilize them to the exclusion of its inherent power to issue orders protecting a parent or child. To the contrary, the use of the word "may" in both subdivisions indicates their application is permissive, not mandatory. (*Montgomery v. Superior Court* (1975) 46 Cal.App.3d 657, 666-667.) The court duly considered mother's request for a restraining order under section 213.5 and Family Code section 6345, but denied it after concluding she did not demonstrate the necessary requirements. That does not mean it was thereafter precluded from using its inherent power to "'ensure the orderly administration of justice'" or "prevent abuses that could undermine the proper administration of justice" by issuing the stay-away order. (*In re M.B.*, *supra*, 201 Cal.App.4th at p. 1064.)

10

## 2. *Denial of Request for Restraining Order*

Mother contends the court abused its discretion in denying her request to renew her domestic violence restraining order under Family Code section 6345. We are not persuaded.

We review a decision to grant or deny a restraining order for an abuse of discretion. (*Salazar v. Eastin* (1995) 9 Cal.4th 836, 850.) "'We view the evidence in a light most favorable to the respondent, and indulge all legitimate and reasonable inferences to uphold the juvenile court's determination. If there is substantial evidence supporting the order, the court's issuance [or denial] of the restraining order may not be disturbed.'" (*In re B.S.* (2009) 172 Cal.App.4th 183, 193.) Such evidence exists here.

Family Code section 6345, subdivision (a) reads: "In the discretion of the court, the personal conduct, stay-away, and residence exclusion orders contained in a court order issued after notice and a hearing under this article may have a duration of not more than five years, subject to termination or modification by further order of the court either on written stipulation filed with the court or on the motion of a party. These orders may be renewed, upon the request of a party, either for five years or permanently, without a showing of any further abuse since the issuance of the original order, subject to termination or modification by further order of the court either on written stipulation filed with the court or on the motion of a party. The request for renewal may be brought at any time within the three months before the expiration of the orders."

"When contested, a request to renew a restraining order should not be granted pursuant to [Family Code] section 6345 simply because the requesting party has 'a subjective fear the party to be restrained will commit abusive acts in the future.' [Citation.] 'The "apprehension" those acts will occur must be "reasonable." That is, the court must find the probability of future abuse is sufficient that a reasonable woman . . . in the same circumstances would have a "reasonable apprehension" such abuse will occur unless the court issues a protective order.' [Citation.] However, an

11

imminent and present danger of abuse is not required. [Citation.] In other words, under this objective test, '[a] trial court should renew the protective order, if, and only if, it finds by a preponderance of the evidence that the protected party entertains a "reasonable apprehension" of future abuse. . . . [T]his does not mean the court must find it is more likely than not future abuse will occur if the protective order is not renewed. It only means the evidence demonstrates it is more probable than not there is a sufficient risk of future abuse to find the protected party's apprehension is genuine and reasonable.' [Citation.] [¶] In evaluating whether the requesting party has a reasonable apprehension of future abuse, 'the existence of the initial order certainly is relevant and the underlying findings and facts supporting that order often will be enough in themselves to provide the necessary proof to satisfy that test.' [Citation.] '*Also potentially relevant are any significant changes in the circumstances surrounding the events justifying the initial protective order. For instance, have the restrained and protected parties moved on with their lives so far that the opportunity and likelihood of future abuse has diminished to the degree they no longer support a renewal of the order?*' [Citation.] Also relevant are the seriousness and degree of risk, such as whether it involves potential physical abuse, and the burdens the protective order imposes on the restrained person, such as interference with job opportunities." (*Lister v. Bowen* (2013) 215 Cal.App.4th 319, 332-333, fn. omitted, italics added.)

The court here essentially determined the circumstances had changed since the initial protective order, namely that the possibility of future abuse had diminished to the point it no longer supported a renewal of the order. (*Lister v. Bowen*, *supra*, 215 Cal.App.4th at p. 333.) In particular, it found the evidence did not support a finding that mother had a "reasonable apprehension of future harm" given that no domestic violence had occurred after the parties separated, nor any indication father used his job resources to try to locate the whereabouts of mother and the children.

12

Substantial evidence supports these findings.  Since the beginning of the dependency in June 2012, father did not physically harm, threaten, contact, or track down mother; nor did he appear at her home or place of employment.  Although he was a deputy sheriff on desk duty and had associates in law enforcement, no evidence was presented he ever used his job resources to locate the address of mother and the children or that he used a firearm when abusing mother.  The court observed a conflict in the evidence as to whether father had asked Clarissa outside the courtroom at a hearing where she was living and concluded only that whatever was said scared Clarissa and that it was unclear "whether it was a willful attempt by father to gain an address or [a] more innocuous question."

Mother asserts the issuance of the stay-away order "constituted a finding [father] was still dangerous, posing a continuing threat of violent behavior against [her], whether he used his firearm or not."  Additionally, he was a deputy sheriff who had "engaged in a long course of violence against [her]," denied her allegations and claimed he was the victim of her violence, and failed to participate in services or return the belongings of mother and the children.  We decline to reweigh the evidence.  ""When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court."""  (*Lister v. Bowen*, *supra*, 215 Cal.App.4th at p. 333.)  Based on the evidence presented, we cannot say ""the trial court exceeded the bounds of reason."""  (*Ibid*.)  Because all mother has shown was that she had was "'a subjective fear" father would "'commit abusive acts in the future'" (*id*. at p. 332), the court did not abuse its discretion in denying mother's request to renew the restraining order under Family Code section 6345.

*3.  Order to Participate in Anger Management and Parenting Programs*

Under section 245.5, "the juvenile court may direct all such orders to the . . . parents . . . of a minor who is subject to any proceedings under this chapter as the

13

court deems necessary and proper for the best interests of . . . the minor. These orders may concern the care, supervision, custody, conduct, maintenance, and support of the minor, including education and medical treatment."

Mother asserts the court erred in ordering her to participate in anger management and parenting programs because they were unnecessary and unrelated to the children's protection. County counsel responds the issue has been forfeited by mother's failure to raise the issue at the trial court level. Mother counters the doctrine does not apply because no one recommended additional services in the trial court. We shall address the issue on the merits.

"The juvenile court has wide latitude in making orders necessary for the well-being of a minor. By statute, the court may make 'all reasonable orders for the care, supervision, custody, conduct, maintenance, and support of the child . . . .' [Citation.] However, the same statute limits such orders to those that are designed to eliminate the conditions that brought the minor to the attention of the court." (*In re Jasmin C.* (2003) 106 Cal.App.4th 177, 180 [no evidence supported "trial court's implied conclusion that mother's attendance in parenting classes is reasonably necessary to avoid a repetition of father's emotional and physical abuse of the minors"].)

Unlike in *In re Jasmin C., supra*, 106 Cal.App.4th 177, substantial evidence supports the court's order in this case. Evidence that mother was not managing her extreme anger toward father well and was expressing her anger in ways that harmed the children included her focus on bringing father to "justice," notwithstanding the therapist's attempts to keep her concentrated on the children's welfare. Mother was frustrated the charges she had brought against father were not being prosecuted the and social worker was concerned this focus on "justice" and the return of her and the children's belongings placed the children more in the middle of the conflict between mother and father. Clarissa's school psychologist indicated mother talked too much about the case and negatively about father and that the more she did so the more the potential "'damage'" it

14

might cause to Clarissa. According to Clarissa's therapist, Clarissa blamed herself for her parents' separation, the dependency case, and losing her home. Additionally, both children had behavioral problems, with Clarissa struggling to concentrate in school and Madeline occasionally being aggressive and using profanity. The court could have reasonably determined the children's problems resulted at least in part from mother's apparent anger at father. The order to participate in anger management and parenting programs was thus reasonably related to the protection of the children.

## DISPOSITION

The order is affirmed.

RYLAARSDAM, ACTING P. J.

WE CONCUR:

FYBEL, J.

IKOLA, J.

15