Filed 2/28/23  In re L.G. CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re L.G. et al., Persons Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES,  Plaintiff and Respondent,  v.  J.G.,  Defendant and Appellant. | E079412  (Super. Ct. Nos. J291868, J291869, J291870)  OPINION |

APPEAL from the Superior Court of San Bernardino County.  Lynn M. Poncin,

Judge.  Affirmed.

Markelz Law Group and Christopher Markelz, for Defendant and Appellant.

Tom Bunton, County Counsel, and Svetlana Kauper, County Counsel, for Plaintiff

and Respondent.

1

I.

INTRODUCTION

Sisters, J.G., D.G., and L.G. (the Children), were removed from their adoptive mother (A.M.) under Welfare and Institutions Code, section 300,[1] subdivisions (b) (failure to protect) and (j) (sibling abuse), because A.M. disciplined 7-year-old J.G. by putting her in a makeshift room in the garage. A.M. appeals the juvenile court's order finding jurisdiction and the disposition order removing the Children from A.M.

A.M. contends the juvenile court erred in admitting into evidence reports by San Bernardino County Department of Child and Family services (CFS). A.M. also argues the juvenile court erred in admitting into evidence police reports documenting a criminal investigation of A.M. committing child abuse. In addition, A.M. argues there was insufficient evidence to support jurisdiction and removal of the Children from A.M. We reject A.M.'s contentions and affirm the jurisdiction and disposition orders.

II.

FACTS AND PROCEDURAL BACKGROUND

Around 2016 or 2017, A.M. adopted J.G. (born in 2014), D.G. (born in 2015), and L.G. (born in 2016). In 2021, A.M. received three additional minor dependents as foster children in her home. A.M.'s uncle, F.F., also lived with A.M. and helped babysit and care for the Children.

---

[1] Unless otherwise noted, all statutory references are to the Welfare and Institutions Code.

On January 16, 2022, CFS received an immediate response referral alleging emotional abuse and general neglect of J.G. A welfare check of J.G. at her home was requested. The caller reported hearing children screaming for help and J.G. was locked in the garage with no food or water. Upon responding to the referral, an investigating social worker, sheriff's deputies, and detectives from Crimes against Children (CAC) discovered a makeshift room in the garage, which had unfinished drywall and plywood walls, and was furnished with a twin bed, heater, small carpet, a small light bulb attached to a cord on the wall, and portable child's toilet filled with urine and fecal matter. The garage room had one door with an exterior deadbolt that could be locked only from the outside with a deadbolt key. The garage room was accessible from a door from the house to the garage, which was kept locked with a deadbolt key. J.G. was not in the garage room when the deputies arrived.

A.M. and F.F. were arrested on January 17, 2022, for child abuse (Pen. Code, § 273a, subdivision (a)), after admitting the garage room was used for discipling J.G. and that she was locked in the room. In the event of a fire, J.G. had no way of exiting the room without someone using a key to let her out. The garage room reportedly had a strong smell of what appeared to be dead animal and human waste. At the entrance of the garage room door with the deadbolt was an animal nesting next to a mouse trap and animal droppings on the water heater shelf.

3

CFS social worker Esparza-Rey met with A.M. at the police station where she was detained. A.M. disclosed she had been having issues with J.G. misbehaving, including not listening at school and stealing since she was five years old. A.M. disciplined her, beginning when she was 5 years old, by locking her in the upstairs bedroom. A.M. said that a few months before her detention, F.F. had the garage room built as a storage room. Because the room was empty, A.M. decided to begin using it for disciplining J.G. by locking her in the room for 15 minute increments.

A.M. told the social worker that in November 2021, she began to have J.G. sleep in the garage room overnight. A.M. said she put a bed, heater, and portable children's toilet in the room for J.G. A.M. locked the room to make sure J.G. did not get into things in the garage. A.M. denied requiring any of her other five children to go into the garage room, which A.M. referred to as "Julie's room." A.M. told the social worker that J.G. became accustomed to being in the garage room and would ask to stay there during the day. A.M. said she would lock J.G. in the garage room at night. In the morning, A.M. would let her out to eat and go to school. On weekends, A.M. would allow J.G. to leave the garage room during the day but would require her to go back to the garage room in the evening to sleep.

A.M.'s uncle, F.F., told the social worker during an interview that he had expressed concern for J.G.'s behavior. He acknowledged he knew A.M. was locking up J.G. in the garage. Occasionally he felt compelled to free J.G. from the garage room and let her go to an upstairs bedroom because it was too cold in the garage. F.F. further

4

stated that during the last few months, J.G. was locked in the garage room every night. F.F. disapproved, but mother disregarded his concerns. F.F. said he bought the home in 2017 and moved in with A.M. and her adopted daughters, J.G., D.G., and L.G. About six months before his interview, A.M. took in three more foster children.

F.F. told the social worker that he assisted A.M. caring for the children by cooking and transporting the children to and from school. F.F. denied there was any physical discipline of any of the minors and denied having further concerns, other than J.G. being required to sleep in the garage room. He contracted a home builder to assist him in building the garage room. It was intended to be a storage room for his brother's personal belongings. After his brother stopped using the garage room, A.M. put a bed in the room and started using the garage room to discipline J.G. He was aware that A.M. was putting J.G. in the garage room every night during the past few months. F.F. stated he would get mad at her and tell her to stop but she was in charge of the children and did it anyway.

When the social worker interviewed the three Children, the Children did not appear to have any scratches or bruises. The Children denied experiencing any physical or sexual abuse, or domestic violence. J.G. was shy during her interview. She said that "mommy" put her to sleep in the garage when she got in trouble. She said she normally was let out of the garage room in the morning to eat breakfast and go to school. She was then locked back in the garage room in the evening after doing her homework and eating dinner. J.G. said she felt safe in A.M.'s care. D.G. and L.G. confirmed that when J.G.

5

got in trouble, "mommy" made J.G. sleep "in her room," which they also referred to as the "outside room."

A. *Juvenile Dependency Petition and Detention Hearing*

After A.M. and F.F. were detained and arrested on January 17, 2022, for child abuse, the Children were detained in protective custody. CFS filed juvenile dependency petitions[2] under section 300, subdivision (b) (failure to protect), as to J.G., and subdivision (j) (sibling abuse), as to D.G. and L.G. During the detention hearing on January 20, 2022, the juvenile court ordered the Children detained in a foster home.

B. *Jurisdiction/Disposition Hearing*

CFS social worker Tony Ramos reported in the February 1, 2022, jurisdiction/disposition report that on January 27, 2022, he interviewed A.M. She told him that the garage room was not J.G.'s room, and that J.G. had an upstairs room in the house. A.M. said the garage room was a storage room, created four or five months ago for storing family supplies, hazardous items, and household items, such as the twin bed found in the room. A.M. stated that J.G. was confused if she thought the garage room was her room and that her confusion might be because the family's living arrangements had been rearranged to accommodate the additional foster children living with them.

---

[2] For ease of reference, we refer to the individual petitions filed on behalf of the three children in the singular, as the petition.

A.M. denied that J.G. had been living in the garage room for a year or any period of time. However, A.M. admitted that it was "a bad idea" to use the garage room to discipline J.G. A.M. adamantly stated several times during the interview that the garage room was not intended to be a child's room, but said she decided to use the room as discipline for J.G. because she had "problems." A.M. said that when J.G. started second grade, she stole items from her classroom and friends. A.M. stated she began using the garage room around the end of November 2021 for time outs for J.G. or to give her "time to relax" for 10 to 15 minutes.

A.M. admitted she locked the garage room when J.G. was in it to keep her away from hazardous materials and other items stored in the garage. A.M. said there was a second door in the garage room that J.G. could use any time to exit out into the backyard, and could then go back inside the house. According to A.M., if J.G. wanted to use the restroom while in the garage room, A.M. ended the timeout and let her use the restroom. A.M. placed the children's toilet in the garage room in case she was unable to hear J.G. when she needed to use the restroom.

A.M. said the toys found in the garage room were there for J.G. to "relax" during timeouts, and the clothing was left in the room when the family had to leave in a rush. A.M. acknowledged the garage room could get cold during timeouts. That was why she put blankets and a heater in there. A.M. admitted J.G. had slept in the garage room four or five times, and two or three times J.G. had slept there because A.M. had forgotten J.G.

was still in the garage room. During the remaining occasions, J.G. slept in the garage room as discipline.

The social worker also interviewed D.G. and L.G. L.G. "was unable to provide meaningful, specific responses when questioned." D.G. acknowledged that J.G. slept in the garage room but did not have an adequate understanding of timeframes and was unable to state how long or on how many occasions this occurred. J.G. told the social worker she had slept in the garage room one time, and that D.G. "lied" when she said J.G. slept in the garage. J.G. stated that the garage room was not hers and that her room was upstairs.

The Children's foster parent reported that J.G. appeared jealous of D.G., and displayed anger and aggression toward her sisters. She had also taken her sisters' food and snacks, and appeared to have a large appetite. J.G. appeared to have low self-esteem and believed A.M. treated her differently than her sisters.

CFS concluded in the jurisdiction/disposition report that, at the time of the report, "there remains a detriment to the children . . . , if they were returned to the care and custody of the adoptive mother . . . [A.M.] requires additional time to continue to address the concerns that brought the family to the attention of [CFS]. CFS is worried that if [A.M.] does not address concerns regarding poor parenting practices as well as inappropriate and/or excessive discipline that she will not be able to appropriately parent her children, placing the children . . . at risk of future harm and/or neglect." CFS further concluded that, "Despite her experience as a resource parent in fostering children, [A.M.]

8

may be ill-equipped to provide appropriate methods of discipline to her children as they become older and enter different developmental stages."

During the jurisdiction/disposition hearing on February 10, 2022, the juvenile court authorized supervised visitation between A.M. and the Children once a week for two hours, after the forensic interviews were completed.

On February 14, 2022, J.G. participated in a forensic interview at the Children's Assessment Center (CAC). J.G. was reluctant to disclose any details. She stated "nothing" happened, when asked what happened to her when she got in trouble. Later, J.G. said A.M. "screamed" at her and her sisters or gave them timeouts when they misbehaved. J.G. said A.M. treated her differently than her sisters. J.G. believed that A.M. did not like her, made her sad, and did not want her. J.G. said she did not like living with A.M., and preferred to stay with her foster mother, who was "nice" and took care of her.

On March 15, 2022, CFS filed an additional information 6.7 report stating that CFS social worker Ramos supervised visitation between A.M. and the Children. The Children were affectionate with A.M., and J.G. was interactive with A.M.

During the further jurisdiction/disposition hearing on March 18, 2022, CFS recommended offering A.M. reunification services. Minors' counsel requested bypassing reunification services and subpoenaed the police report in support of its bypass request.

On April 29, 2022,[3] CFS filed another additional information 6.7 report which stated that on April 12, 2022, social worker Daisy Castaneda reported that A.M. had told the Children that they would be returning home the week ending April 15, 2022. This was an improper, false promise, which should not have been discussed with the Children. Castaneda stated she intended to address the issue with A.M.

During the further contested jurisdiction/disposition hearing on May 5, 2022, the juvenile court stated it received the 6.7 report filed on April 29, 2022, and also the declaration by a Children's Advocacy Group (CAG) social worker, Alexa Roldan. Minors' counsel stated it had received the detective's Crimes Against Children report and intended to call as witnesses the CFS current case worker, Castaneda, and her supervisor, Williams. Minors' counsel also intended to subpoena the Children's caretaker.

The CAG declaration by Roldan stated that she was an investigating social worker employed by CAG, counsel for minors. On April 13, 2022, she visited the Children at their caretaker's home. The caretaker told her that the Children frequently argued with each other and during one such argument, the caretaker overheard D.G. say to J.G., "'That's why you were locked away.'" The caretaker believed D.G. may have been favored among the Children because the caretaker heard D.G. say things like, "'my mom wants me to go to college but not [J.G.],'" and "'I had beautiful dresses but not [J.G.].'"

---

[3] Handwritten above the court file stamp is the date, "5/5/22," and the attachment to the 6.7 report states the police reports were attached to the 6.7 report dated "5/5/22."

The police reports filed with the juvenile court, included the initial report by Sheriff's Deputy Vega, who responded to the referral on January 16, 2022. Upon arriving at the home, A.M. told Deputy Vega: "'It's because I disciplined her, and she yelled loudly.'" Upon entering the garage, Deputy Vega observed a makeshift room and smelled a strong odor of urine. The garage room was 8 feet by 10 feet wide, with a door with a deadbolt that could only be locked with a key from the outside. Whoever was in the garage room could not get out. The room did not have any food, running water or means to call for help.

A.M. told Deputy Vega the garage room was a playroom. She denied using the room to lock up the Children. A.M. denied anyone stayed in the room but Deputy Vega saw a child training toilet in the room with a substantial amount of urine that had overflowed. A.M. said the Children used the garage toilet when they played there and could not get to the bathroom inside the house in time. Deputy Vega concluded this did not make sense because there was a bathroom inside the house about 8 feet from the garage access door.

During F.F.'s interview, he changed his responses regarding the garage room several times. Initially, he said the garage room was used by a relative during visits. F.F. later said A.M. put "the girls" in the garage room when they misbehaved. He said only J.G. was locked up in the room overnight because she misbehaved a lot. A little later, F.F. denied J.G. stayed in the room overnight, and said the room was used for

11

disciplinary purposes during the daytime. He then said that J.G. stayed in the garage room overnight only when she acted up.

Deputy Vega spoke with D.G. and two of the foster children living at A.M.'s home. They said the garage room was "[J.G.]'s full time room and at time[s], [J.G. was] locked in the room." J.G. was shy and did not want to talk to Deputy Vega. However, she acknowledged that she "sometimes" slept in the garage. She denied she was locked in the garage room but looked the other way when speaking, which led Deputy Vega to believe she was not truthful. Deputy Vega concluded that J.G. permanently resided in the garage room and possibly was locked in the room without food or water. Deputy Vega therefore arrested A.M. for child cruelty under Penal Code section 273a(a), and the case was referred to the specialized investigative division, Crimes Against Children.

On January 16, 2022, Sheriff's Deputy Quezada of the Crimes Against Children division, visited A.M.'s home with a search warrant. His observations of the garage room were similar to those of Deputy Vega. After advising A.M. and F.F. of their *Miranda* rights, F.F. told Deputy Vega the children shared two bedrooms upstairs in the house while the two youngest foster children slept in cribs in A.M.'s bedroom. Initially, he said he did not know where J.G. slept because he did not go upstairs. Later, he said he witnessed A.M. put J.G. in the garage room "approximately six times," beginning about "one month prior to the interview," as a new method of punishment. He further stated that about 15 days before the interview, A.M. got a space heater because the garage got too cold. F.F. said that when J.G. was locked in the garage room, A.M. would place her

12

there at about 10:00 p.m., lock the room with the deadbolt, and turn off the light. A.M. would let J.G. out at about 6:00 a.m. the next morning. F.F. acknowledged that J.G. had no means of communicating with A.M. or F.F. while she was locked in the garage room. A.M. last locked J.G. in the garage room on January 15, 2022.

Deputy Quezada interviewed A.M. also on January 16, 2022. She admitted her statements regarding the garage room had been inconsistent, in that she initially denied that J.G. slept in the garage room, and then later confirmed that J.G. had slept there the night before. A.M. said the garage room was constructed about three to four months before her interview with Deputy Quezada, and she started locking J.G. in the garage room for misbehaving two months before the interview. She put a rug and space heater in the room because she knew there was no heat there and the garage would get cold. In fact, it was so cold she would not even allow her dogs to spend the night there. She also put a small training toilet in the garage room because A.M. was upstairs and could not hear J.G. if she asked to use the restroom.

A.M. told Deputy Quezada that she placed J.G. in the garage room seven or eight times, from about 6:00 p.m. until the following day at about 5:30 a.m. When J.G. was in the room, A.M. locked it with the deadbolt. A.M. acknowledged she was not supposed to leave J.G. in the garage room because it was intended to be a storage room and would be "scary" for J.G. All of the other five children slept inside the house. A.M. changed her statement and admitted the garage room was J.G.'s permanent bedroom because of her

13

bad behavior. A.M. also admitted she made a "mistake." She knew she should not have used the garage room as J.G.'s bedroom.

Also on January 16, 2022, Sheriff's Deputy Lopez interviewed A.M.'s neighbor, who told him her 8-year-old daughter went to the same school as J.G. and her 13-year-old daughter had befriended J.G. The neighbor's two daughters told her in November 2021, that J.G. had said she was constantly locked in the garage and not being fed. On January 16, 2022, the neighbor took a video and photographs of J.G. in her pajamas, talking to the neighbor's daughters from A.M.'s garage door. The neighbor heard A.M. yell at J.G., slam the garage door closed, and then children crying and yelling for help. Around noon on January 16, 2022, the neighbor decided to call law enforcement and request they check on J.G. and the other children in the home. The neighbor provided Lopez with copies of the video and photographs.

Lopez interviewed the neighbor's 8-year-old daughter, A.P., who said she had spoken to J.G. through the garage door and had seen J.G. ask other children at school for their lunch even though she had food of her own. On occasion, J.G. told her she had not eaten for a whole day. On one occasion, A.P. tried to speak to J.G. through the window of her house and A.M. shut the window, yelled at J.G., and punished J.G. for talking to A.P. A.P. told Lopez that J.G. "was always inside her bedroom in the garage, not doing anything because there was nothing in her room except for a bed."

Lopez interviewed one of A.M.'s other foster children who was four years old and had lived with A.M. during the past six months. The foster child said that on January 16, 2022, A.M. overheard her and her brother bickering and punished the foster child by ordering her to go to J.G.'s "room" in the garage. The foster child pleaded with Lopez not to ask A.M. about the incident because A.M. "would be mad."

D.G. and L.G. were also interviewed on January 16, 2022. D.G. confirmed J.G.'s room was in the garage and J.G. slept there every night. A.M. did not allow D.G. to go in the garage room. L.G. stated that J.G. slept in the "backyard" while the other children slept upstairs in the house. L.G. was unable to describe the "backyard" room because she was not permitted to go there or play with J.G. When asked who slept in the garage, L.G. said that J.G. did.

Deputy Barranco interviewed J.G. on January 16, 2022. When asked where her bedroom was, J.G. pointed to the garage. She said she was not permitted to leave her garage room or play outside. When asked why she slept in the garage room, J.G. said she was told to but she liked it. When asked where she went to the bathroom, she said she used the toilet in the garage room. She said she received food and water throughout the day.

At the continued contested jurisdiction/disposition hearing on June 2, 2022, A.M.'s attorney objected to admitting into evidence the CFS and police reports on the ground the authors were not present to testify. The juvenile court overruled A.M.'s attorney's objections to the reports and admitted them into evidence. CFS's attorney

15

proposed attaching the police reports to the 6.7 report. The juvenile court did so over A.M.'s attorney's objection.

During the jurisdiction/disposition hearing, Williams, the current CFS supervising social worker, testified he was aware of the details of the investigation, discussed them with the social worker assigned to the case (carrier social worker), including discussing bypassing reunification services, the least intrusive options, and the best interests of J.G. Williams agreed with the recommendation to sustain the petition allegations and remove the Children from A.M. In Williams's opinion, removal was warranted because of A.M.'s general neglect of J.G., inappropriate discipline, and A.M.'s inability to appropriately correct J.G.'s behavior. Williams stated that, even if the garage room was dismantled, there was a risk of escalation of discipline to physical discipline because A.M. lacked understanding of appropriate discipline. A.M. had not provided any certificates of completion of dispositional services nor was A.M. able to verify completion of classes. Williams was also concerned A.M. had changed her story several times regarding J.G.'s bedroom, and even though A.M. was a trained foster parent, she had nevertheless used disproportionate, inappropriate discipline. In Williams's opinion, A.M. was likely to abuse or neglect the Children again without additional training and tools.

CFS social worker Castaneda, who was the current carrier social worker assigned to the case, testified that the Children expressed "hesitance" about returning to A.M.'s care. A.M. showed remorse for her actions but had not provided any certificates of

16

completion or progress reports to prove participation in any programs. Castaneda agreed with the recommendation the Children be removed from A.M. Castaneda had observed during visits that the Children frequently argued and A.M., instead of addressing the Children's issues of discord, merely separated the Children and sent them into isolation. Before the Children were returned to A.M., Castaneda believed A.M. should demonstrate applying skills learned in parenting class. Castaneda had not seen A.M. use any newly learned parenting techniques.

A.M. testified that J.G. had behavioral issues beginning when she was four or five years old. After the Children were detained, A.M. attended two classes in which she learned methods of disciplining, one of which was timeouts. A.M. said she used the garage room for timeouts, but the room no longer existed. A.M. admitted she locked J.G. in the garage room overnight but did so only one time. After reviewing the police reports, she denied her prior statements made to the police. A.M. was willing to continue participating in services.

After additional witness testimony and argument by the parties' counsel on June 6, 2022, the court found jurisdiction over the Children under section 300, subdivision (b) as to J.G., and (j) as to D.G. and L.G. As to the disposition, the court found A.M.'s testimony not credible and that she had "absolutely no insight as to the reason her children were removed from her care." The court ordered reunification services for A.M., over minors' counsel's objection, and ordered the Children removed from A.M.'s custody.

17

## III.

## ADMISSIBILITY OF THE SOCIAL SERVICE AGENCY REPORTS

A.M. contends CFS's reports were improperly admitted into evidence. We disagree.

A. *Procedural Background*

During the continued jurisdiction and disposition hearing on May 5, 2022, the court and counsel discussed off the record possible witnesses who would testify at the contested jurisdiction/disposition hearing set on June 2, 2022. Back on the record, the court stated that minors' counsel would be calling the current carrier social worker, Daisy Castaneda, and the supervising social worker, Leslie Williams, who signed off on the jurisdiction/disposition report.

CFS social workers, Williams and Castaneda, attended the contested jurisdiction/disposition hearing on June 2, 2022. During the hearing, CFS requested the juvenile court to admit into evidence CFS's detention, jurisdiction/disposition and additional information 6.7 reports. A.M.'s attorney, Christopher Markelz, objected on the ground the authors of the reports were not present to testify. Counsel for CFS, Catherine Wollard, responded that Wesley Williams was one of the authors of the jurisdiction report. The court noted that at the previous hearing, the only witnesses mentioned who would be testifying were A.M., Williams, Castaneda, and the caretaker.

Markelz stated he was objecting because CFS social worker Tony Ramos, who wrote the jurisdiction/disposition report, conducted the reported interviews and Williams was not present during the interviews. Wollard stated that Williams was familiar with and involved in the case, talked to all of the parties, discussed the case with Ramos, was aware of the information in the report, reviewed the report, and signed it. Wollard further noted that at the previous hearing, there was no request for Ramos to testify and, as discussed at the last hearing, Ramos was no longer employed with CFS. Markelz stated that it was also discussed that Ramos would have to be present and, if necessary, CFS would subpoena him. Wollard asserted that was not discussed.

The court stated it was limited by the minute order, which stated that the only social workers ordered to appear where Castaneda and Williams. Ramos was not mentioned and was no longer employed by CFS. The court then confirmed that CFS wanted admitted into evidence the CFS reports, and Markelz again objected. In response, the court stated: "Again, the witnesses were specifically identified on May 5, 2022, as Social Worker Daisy Castaneda, Supervisor Wesley Williams, and the current caretaker. Social Workers are ordered to be present in person for testimony. That's in the minute order from May 5th. It's also in the Court's notes regarding witnesses." The court noted minor's counsel was not objecting to the reports and, over Markelz's objection, ordered the reports would be received into evidence.

19

B. *Applicable Law*

In *In re Malinda S.* (1990) 51 Cal.3d 368, 376 (*Malinda S.*), the California Supreme Court held that at a jurisdictional hearing, hearsay in a social worker's report is admissible, provided the social worker is available to be cross-examined at the request of a parent. The court relied on section 281, which provides that the social worker "'shall upon order of any court in any matter involving the custody, status, or welfare of a minor or minors, make an investigation of appropriate facts and circumstances and prepare and file with the court written reports and written recommendations in reference to such matters. *The court is authorized to receive and consider the reports* and recommendations of the [social worker][4] in determining any such matter.'" (*Malinda S.*, *supra*, at p. 376.) The court in *Malinda S.* noted that "section 281 is quite broad," as it applies "'in *any* matter involving the *custody, status or welfare* of a minor,'" and it authorizes the court to consider the reports "'in determining *any such matter.*'" (*Malinda S.*, *supra*, at pp. 378-379.)

Based on legislative intent, the *Malinda S.* court concluded that section 281 was intended to "to create a hearsay exception for social studies. . . ." (*Malinda S.*, *supra*, 51 Cal.3d at p. 379; see also *id*. at pp. 376-381) The *Malinda S.* court further concluded that hearsay in a social worker's report can be sufficient to support a jurisdictional finding.

---

[4] Section 281 actually refers to "'[t]he probation officer.' However, Welfare and Institutions Code section 215 provides: 'As used in this chapter, unless otherwise specifically provided, the term 'probation officer' . . . shall include . . . any social worker in a county welfare department . . . .'" (*In re M.B.* (2011) 201 Cal.App.4th 1057, 1069, fn. 6.)

20

(*Id.* at pp. 381-382; see also *In re M.B.*, *supra*, 201 Cal.App.4th at p. 1069.)  The *Malinda S.* court held that a social worker's report was admissible only if the authoring social worker was available for cross-examination, on request.  (*Malinda S.*, *supra*, at p. 378.)  Such a requirement, the *Malinda S.* court concluded, protected the parent's due process rights.  "[I]f a parent wanted to cross-examine a declarant whose hearsay was contained in the reports, it was up to the parent to subpoena the declarant."  (*In re M.B.*, *supra*, at p. 1069, citing *Malinda S.*, *supra*, at pp. 382-385.)

In re Corey A. (1991) 227 Cal.App.3d 339 (*Corey*), extended *Malinda S.* to a dispositional hearing.  (*Corey A.*, *supra*, at pp. 342, 348; *In re M.B.*, *supra*, 201 Cal.App.4th at p. 1070.)  The court in *Corey A.*, noted that, "[u]nder section 355, more stringent evidentiary requirements must be met at the jurisdictional hearing where the court initially intervenes and obtains jurisdiction over the child.  At the subsequent dispositional phase, any relevant evidence including hearsay shall be admitted pursuant to section 358, subdivision (b) to help the court determine the child's best interests."  (*Corey A.*, *supra*, at p. 347.)  *Corey A.* further noted that, unlike at the jurisdictional hearing, there was no statute or rule requiring that the preparer of the report be made available for cross-examination at the dispositional hearing.  (*Id.* at pp. 347-348; *In re M.B.*, *supra*, at p. 1070.)

The *Corey A.* court held that "the preparer of a social study need not testify to establish a foundation for admission of that report in evidence at a dispositional hearing, and that a parent's constitutional right to confront the preparer of the report is satisfied so

21

long as that person is available to the parent upon request or by service of process." (*Corey A.*, *supra*, 227 Cal.App.3d at p. 342.) The *Corey A.* court rejected the parent's contention that the department of social services' failure to produce the social worker who compiled the social study,[5] absent any request that it do so, denied her due process. (*Id.* at p. 342.)

In 1996, the Legislature amended section 355 to partially codify and modify the holding in *Malinda S.* (See Stats.1996, ch. 36, § 1; *In re Lucero L.* (2000) 22 Cal.4th 1227, 1240 (*Lucero*); *In re Cindy L.* (1997) 17 Cal.4th 15, 22, fn. 3.) Section 355, subdivision (a), now provides as to a jurisdictional hearing that "[a]ny legally admissible evidence that is relevant to the circumstances or acts that are alleged to bring the minor within the jurisdiction of the juvenile court is admissible and may be received in evidence." Subdivision (b) of section 355 provides that "a social study . . . and hearsay evidence contained in it, is admissible and constitutes competent evidence upon which a finding of jurisdiction pursuant to [s]ection 300 may be based, to the extent allowed by subdivisions (c) and (d)."

Under section355, subdivision (c), only certain types of hearsay are sufficient to support a jurisdictional finding. Subdivision (c)(1) provides that "[i]f a party to the jurisdictional hearing raises a timely objection to the admission of specific hearsay

---

[5] Section 355, subdivision (b)(1) defines "'social study'" as "any written report furnished to the juvenile court and to all parties or their counsel by the county probation or welfare department in any matter involving the custody, status, or welfare of a minor in a dependency proceeding . . . ."

evidence contained in a social study, the specific hearsay evidence shall not be sufficient by itself to support a jurisdictional finding or any ultimate fact upon which a jurisdictional finding is based, unless the petitioner establishes one or more of the following exceptions[.]"

Relevant here is the following exception: "The hearsay declarant is a minor under 12 years of age who is the subject of the jurisdictional hearing. However, the hearsay statement of a minor under 12 years of age shall not be admissible if the objecting party establishes that the statement is unreliable because it was the product of fraud, deceit, or undue influence." (§ 355, subd. (c)(1)(B)), as added by Stats.1996, ch. 36, § 1; see also Cal. Rules of Court, rule 5.684(b).)

In *Lucero L.*, *supra*, 22 Cal.4th 1227, the court held, "consistent with the language of section 355, subdivision (b), that the hearsay statements contained in social studies should be admissible even if they do not meet the requirements of the child dependency exception and even if the minor is incompetent to testify." (*Id*. at pp. 1242-1243.) The *Lucero L.* court rejected the parents' argument that under *Malinda S.*, *supra*, 51 Cal.3d at page 382, allowing such hearsay without the opportunity for cross-examination is a violation of due process. (*Lucero L.*, *supra*, at pp. 1243-1244; see also U.S. Const., Amend. XIV; Cal. Const., art. I, § 7, subd. (a); *Malinda S.*, *supra*, at p. 382, quoting *Long v. Long* (1967) 251 Cal.App.2d 732, 736.) "The parents' argument that the admission of hearsay evidence, per se, is a violation of due process, is without merit. In *Malinda S.*, our only constitutional holding was that due process did not require the government to

23

make available persons quoted in a social study as long as the parties opposing the government had an opportunity to subpoena them." (*Lucero L.*, *supra*, 22 Cal.4th at pp. 1243-1244, quoting *Malinda S.*, *supra*, at p. 384.)

But, "[e]xcept in those instances recognized by statute where the reliability of hearsay is established, 'hearsay evidence alone "is insufficient to satisfy the requirement of due process of law, and mere uncorroborated hearsay does not constitute substantial evidence. [Citation.]"'" (*Lucero L.*, *supra*, 22 Cal.4th at pp. 1244-1245, quoting *Gregory v. State Bd. of Control* (1999) 73 Cal.App.4th 584, 597.) "Section 355, subdivision (c)(1), also incorporates this due process principle, providing that a hearsay statement contained in a social study that is inadmissible in a criminal or civil trial generally cannot 'by itself . . . support a jurisdictional finding or any ultimate fact upon which a jurisdictional finding is based.'" (*Lucero L.*, *supra*, 22 Cal.4th at p. 1245.)

However, the court in *Lucero L.* concludes section 355, subdivision (c)(1)(B), provides an exception to this rule. "It provides that hearsay statements contained in a social study can serve as sole support for a jurisdictional finding if '[t]he hearsay declarant is a minor under the age of 12 years who is the subject of the jurisdictional hearing.'" (*Lucero L.*, *supra*, 22 Cal.4th at p. 1245, quoting section 355, subd. (c)(1)(B))

"Although there is nothing unconstitutional about allowing the minor's hearsay statements to be admitted in a jurisdictional proceeding, subject to exclusion only on grounds of fraud, deceit, or undue influence, a serious due process problem is raised by permitting, as section 355, subdivision (c)(1)(B) does, sole reliance on such statements

24

without any particular indications of the statements' reliability." (*Lucero L.*, *supra*, 22 Cal.4th at pp. 1245-1246.)

"Although a jurisdictional finding in a section 300 proceeding does not necessarily lead to a termination of parental rights, it is the first step in the termination process and must be protected by due process guaranties." (*Lucero L.*, *supra*, 22 Cal.4th at p. 1247.) "Because the corroboration requirement is not imposed by due process, and because section 355 specifically authorizes the admittance of and reliance on the hearsay statements of minors who are the subject of dependency proceedings without reference to corroboration, we conclude that corroboration is not necessary in this context." (Id. at p. 1249; see also *In re B.D.* (2007) 156 Cal.App.4th 975, 984.)

C. *Analysis*

A.M. argues the CFS reports were inadmissible during the jurisdiction/disposition hearing on June 2 and 6, 2022, because social worker Ramos was not available for cross-examination. We disagree the CFS reports were inadmissible during the jurisdiction hearing under section 355, subdivision (a). Furthermore, hearsay contained in the reports was admissible under subdivision (b), to the extent allowed in subdivision (c) of section 355.

Subdivision (c)(1) provides that if a party timely objects to the admission of "specific hearsay evidence contained in a social study, the specific hearsay evidence shall not be sufficient by itself to support a jurisdictional finding or any ultimate fact upon

25

which a jurisdictional finding is based, unless one of the exceptions" in section 355, subdivision (c)(1) applies.

Here, at the jurisdiction/disposition hearing on May 5, 2022, the parties discussed the witnesses they intended to call during the contested jurisdiction/disposition hearing on June 2, 2022. A.M.'s attorney was informed Ramos was no longer employed by CFS. Based on the unreported discussion among the court and parties, the court confirmed on the record that that minors' counsel would be calling as witnesses the current carrier social worker, Castaneda, and her supervisor, Williams. A.M.'s attorney did not request the presence of any other witnesses, such as Ramos, and did not state that A.M. intended to call any other witnesses.

A.M. argues that CFS should have produced Ramos to testify at the June 2, 2022, contested jurisdiction/disposition hearing, but nothing in the record establishes that A.M. made a timely request[6] or that CFS was required to produce Ramos, when Ramos was no longer employed by CFS. Furthermore, A.M.'s attorney could have subpoenaed Ramos but failed to do so. Also, although at the June 2, 2022, contested jurisdiction/disposition hearing, A.M.'s attorney objected to admission into evidence of CFS's reports, he did not timely object to any specific hearsay statements contained in the reports, as is required under section 355, subdivision (c)(1).

_____

[6] Markelz informed the court at the June 2, 2022, hearing that he had done so during the previous May 5, 2022, hearing, but CFS's attorney disagreed. The court checked its notes and the record, including the May 5, 2022 minute order, and found there had been no request that Ramos appear at the June 2, 2022 hearing.

He also did not request a continuance for the purpose of subpoenaing Ramos. Section 355, subdivision (b)(2) states that the preparer of the social study (CFS report) "shall be made available for cross-examination upon a timely request by a party." Subdivision (b)(3) states that "[t]he court may grant a reasonable continuance not to exceed 10 days upon request by any party if the social study is not provided to the parties or their counsel within a reasonable time before the hearing." Furthermore, at that time Ramos was no longer employed by CFS, A.M. had not subpoenaed Ramos, and A.M.'s attorney did not request a continuance to do so under section 355, subdivision (b)(3).

In addition, even assuming A.M.'s attorney's objection to the CFS reports was timely and sufficiently specific as to hearsay statements in the reports, the Children's hearsay statements were nevertheless admissible to support the jurisdiction findings under the section 355, subdivision (c)(1)(B) exception. The Children declarants were under the age of 12, were the subject of the jurisdiction hearing, and A.M. made no showing that the statements were unreliable based on fraud, deceit, or undue influence. (§ 355, subd. (c)1)(B).)

Under *Lucero* there is no due process requirement that the declarant minors be available for cross-examination or that their statements be corroborated (*Lucero L.*, *supra*, 22 Cal.4th at pp. 1242, 1249; § 355, subd. (c)(1)(B)). Corroboration is also not statutorily required under the section 355, subdivision (c)(1)(B) exception because A.M. has not established that the Children's hearsay statements in the CFS reports were unreliable because they were the product of fraud, deceit, or undue influence. Even if

27

corroboration was required, there was ample evidence corroborating the Children's statements, including testimony by A.M., A.M.'s uncle, A.M.'s neighbor, and social workers, Castaneda and Williams, as well as documentary evidence, including photographs taken by A.M.'s neighbor, sheriff's reports, and a declaration by a CAG investigating social worker.

1. Absence of Ramos at the Jurisdiction/Disposition Hearing

A.M. contends that the CFS reports were inadmissible because Ramos was unavailable for cross-examination. He was the CFS carrier social worker who signed the jurisdiction/disposition report filed on February 1, 2022, and the two additional information 6.7 reports filed on March 15, 2022, and April 29, 2022.

This case is analogous to *In re J.H.* (2018) 20 Cal.App.5th 530, 537 (*J.H.*), in which, under similar circumstances, the court held that a social study report was admissible hearsay, even though the carrier social worker was not available for cross-examination. In *J.H.*, nine days before the 12-month review hearing, the department of social services (DSS) informed the father that the author of the 12-month report would not be available to testify because she no longer worked at DSS. Her former supervisor would be available instead. At a pretrial proceeding the day before the hearing, the father's attorney said she had not subpoenaed the author of the report but nevertheless requested the social worker's presence in court. The social worker was not present during the 12-month hearing.

The father in *J.H.* filed a writ petition on the ground the juvenile court erred in considering the social services report in the absence of its primary author, and thus prevented cross-examination of her at the 12-month status review hearing. The *J.H.* court rejected the father's contention on appeal that the juvenile court violated his due process right to cross-examine witnesses when it considered the DSS social study report without permitting him to cross-examine the author of the report.

As the court in *J.H.* explained, "A parent in a dependency proceeding has a due process right to confront and cross-examine witnesses. [Citation.] But due process does not require 'full-fledged cross-examination.' [Citation.] Rather, all that is required is '""'"that the procedure adopted comport with fundamental principles of fairness and decency."'"' [Citation.] Due process is a flexible concept that weighs 'any possible hardship to the parent [against] the state's legitimate interest in providing an expedited proceeding to resolve the child's status without further delay.' [Citations.]" (*J.H.*, *supra*, 20 Cal.App.5th at p. 536.) The *J.H.* court found that the juvenile court's decision to permit testimony from the supervisor of the author of the report, in lieu of the author's testimony, was not an abuse of discretion. (*Id*. at p. 536.)

We recognize that *J.H.* is distinguishable because the instant case involves a jurisdiction hearing. But as discussed above, statutorily, cross-examination of Ramos was not required because A.M. did not timely request Ramos's availability at the jurisdiction hearing, Ramos was no longer employed by CFS, CFS informed A.M. of this, A.M.'s attorney did not specifically request Ramos's presence at the jurisdiction hearing

29

when told his supervisor and the current carrier social worker would be the only social worker witnesses, A.M. did not subpoena Ramos, and A.M. did not request a continuance for the purpose of subpoenaing him. (See § 355, subd. (b)(2), (3).)

Just as in this case, the court in *J.H.* concluded there was no due process right to confront and cross-examine the social worker in part because DSS informed the father's counsel that the social worker would not be available at the hearing because the social worker was no longer employed by DSS, the father did not subpoena the social worker, father had notice that the social worker's supervisor would testify instead, and the supervisor was available at the hearing for cross-examination. (*J.H.*, *supra*, 20 Cal.App.5th at pp. 534, 537.) Also, here, as in *J.H.*, Ramos's supervisor, Williams, was intimately familiar with the case, had spoken to the parties, including the Children and A.M., had read the reports, had discussed the case with Ramos, and had co-signed the jurisdiction/disposition report and additional information 6.7 reports.

We conclude that under these circumstances, there was no statutory violation, due process violation, or abuse of discretion committed by the juvenile court admitting into evidence the CFS reports and hearsay statements contained therein.

2. Roldan Declaration Confused with April 29, 2022, 6.7 Report

A.M. argues in her reply to CFS's appellate respondent's brief, that the police reports and declaration by Alexa Roldan are not social study reports admissible under section 355. We agree. Section 355, subdivision (b)(1) defines "'social study'" as "any written report furnished to the juvenile court and to all parties or their counsel by the

30

county probation or welfare department in any matter involving the custody, status, or welfare of a minor in a dependency proceeding . . . ." The police reports and Roldan's declaration were not reports by the county probation or welfare departments.

The minor's attorney, Aldwin Tanala, of CAG, filed the Roldan declaration on May 5, 2022. Roldan, at that time, was an investigating social worker for CAG, which was retained to represent the Children in this case. Roldan stated in her declaration that when she visited the Children at their home on April 13, 2022, the caretaker told her she overheard D.G. tell J.G., when they were bickering, "'That's why you were locked away.'" The caretaker also told Roldan that she believed A.M. had shown favoritism to D.G., because D.G. had said, "'my mom wants me to go to college but not [J.G.],'" "I had beautiful dresses but not [J.G.]," and other similar comments.

It is apparent from the record, including from the court's and parties' statements, that when the court referred to the May 5, 2022, "CFS 6.7 report" and ordered the police reports attached to it, the court was referring to the 6.7 report filed on April 29, 2022, not the Roldan declaration. In the record on appeal, the police reports are file stamped as attached to the 6.7 report filed on April 29, 2022, which is the only 6.7 report.

We agree the police reports and Roldan declaration are not social study reports admissible under section 355. Even so, we conclude the CFS reports, including the detention report, jurisdiction/disposition report, and additional information reports filed on March 15, 2022, and April 29, 2022, were admissible as social study reports under section 355, subdivision (b)(1).

31

IV.

ADMISSIBILITY OF THE POLICE REPORTS[7]

A.M. contends the juvenile court erred in admitting into evidence police reports as business records and relying on hearsay contained in the reports during the jurisdiction/disposition hearing. A.M. also argues the reports were inadmissible business records because the authors of the reports were not available for cross-examination and confrontation.

A. *Procedural Background Regarding the Police Reports*

During a further jurisdiction/disposition hearing on March 18, 2023, minors' counsel, David Knuchell of CAG, requested a three-week continuance because his office subpoenaed the police reports in January 2022, in support of the minors' request for bypassing reunification services, and CAG had not yet received the police reports. The court continued the hearing and noted that CFS had just filed a 6.7 report with new findings and orders.

At the continued further jurisdiction/disposition hearing on April 14, 2022, Minors' counsel, Aldwin Tanala of CAG, informed the court that he had obtained the subpoenaed police reports and distributed copies to the other counsel. Tanala requested,

---

[7] The parties refer to the law enforcement reports as "police reports." However, the law enforcement reports in the record were prepared by the San Bernardino County Sheriff's Department, not by the police. There is mention of a Hesperia police report but there is no such report in the record on appeal. For purposes of avoiding confusion, we will refer to all law enforcement reports generically as "police reports."

and was granted, an additional continuance because he had not received the complete police reports, which included the detective's report from Crimes Against Children.

During the continued further jurisdiction/disposition hearing on May 5, 2022, the court noted it had received a second 6.7 report and a declaration by CAG social worker, Alexa Roldan. Tanala stated he had just received the detective's Crimes Against Children report and would be providing copies to counsel. He also requested the court to set the matter for a contested jurisdiction/disposition hearing and requested bypass of services.

During the contested jurisdiction/disposition hearing on June 2, 2022, CFS requested the court to enter into evidence the January 20, 2022, detention report, the February 1, 2022, jurisdiction/disposition report, the March 15, 2022, 6.7 additional information report, and the April 29, 2022, 6.7 additional information report.[8] A.M.'s attorney, Markelz, objected to the CFS reports on the ground the authors of the reports were not present. CFS's attorney responded that the current carrier social worker and Ramos's supervisor were present to testify, and Markelz had not requested Ramos's presence or any other social worker to be present.

Also during the contested jurisdiction/disposition hearing, Tanala requested the subpoenaed police records, including the detective Crimes Against Children records, be entered into evidence. CFS's attorney suggested attaching the records to the 6.7 report

---

[8] CFS's attorney erroneously stated the jurisdiction/disposition report was dated February 10, 2022; the 6.7 report was dated March 18, 2022; and the second 6.7 report was dated May 5, 2022.

33

with the other police reports. Markelz objected on the grounds the authors of the reports were not present. CFS's attorney, Wollard, noted that if Markelz wanted the police officers in court, he was required to subpoena them and failed to do so.

The court stated that Tanala had submitted a declaration by the custodian of records, Shelby Dube, stating the documents were computer-generated, and accurate copies of electronically stored information in the San Bernardino County Sheriff's Department databases. The custodian also declared the subpoenaed documents to be compiled by the sheriff's department personnel in the ordinary course of business around the time the acts were recorded. The court therefore found the records to be subject to the business records hearsay exception, received into evidence, and attached to the 6.7 report dated April 29, 2022, which the court erroneously stated was dated May 5, 2022. There is no report in the record dated May 5, 2022. We note that "5/5/22" is handwritten above the April 29, 2022, file stamp on the April 29, 2022, 6.7 report and the Sheriff's Declaration subpoena duces tecum and Sheriff's records are attached to the April 29, 2022, 6.7 report. The Sheriff's Declaration subpoena duces tecum contains a stamp stating, "Attachment to: 6.7; Report Dated: 5-5-2022," indicating the court's confusion or erroneous assumption the April 29, 2022, 6.7 report was filed on May 5, 2022.

After entering into evidence the CFS reports and police reports, including the sheriff's subpoenaed records and reports attached to the April 29, 2022, 6.7 report, the court proceeded with the hearing by allowing witness testimony and argument by counsel. At the end of the hearing, the court noted that Markelz had not requested a

34

continuance to have the police officers present at the hearing. The court added that, although the court was reluctant to refer to the subpoenaed police reports because Markelz had objected to them being received into evidence, the court concluded that, even not considering the police reports, there was sufficient evidence in the detention report, jurisdiction report, and the uncle's statements, to establish the number of times J.G. was in the garage room over a period of time.

B. *Discussion*

Generally, police reports contain multiple hearsay and do not qualify under the business records hearsay exception. (*People v. McVey* (2018) 24 Cal.App.5th 405, 415; *Melendez-Diaz v. Massachusetts* (2009) 557 U.S. 305, 321 [certain documents kept in regular course of business, such as police reports generated by law enforcement officials, are not subject to business records hearsay exception because "the regularly conducted business activity is the production of evidence for use at trial"].)

A.M. argues that the police records are also not admissible under the section 355, subdivision (c)(1)(C) exception. That statute provides in relevant part that, "If a party to the jurisdictional hearing raises a timely objection to the admission of specific hearsay evidence contained in a social study, the specific hearsay evidence shall not be sufficient by itself to support a jurisdictional finding or any ultimate fact upon which a jurisdictional finding is based, unless the petitioner establishes one or more of the following exceptions: [¶] . . . [¶] [¶] (C) The hearsay declarant is a peace officer . . . , a social worker licensed . . . . For the purpose of this subdivision, evidence in a declaration

is admissible only to the extent that it would otherwise be admissible under this section or if the declarant were present and testifying in court."

Here, A.M.'s attorney, Markelz, objected when the juvenile court ordered the subpoenaed police reports entered into evidence and attached to the April 29, 2022, 6.7 report. Markelz's objection was not made to any specific hearsay evidence, other than generally to the police reports. Even assuming A.M.'s objection was timely and to "specific hearsay evidence contained in a social study," the police report hearsay was subject to the section 355, subdivision (c)(1)(C) hearsay exception as hearsay by a peace officer declarant.

A.M. argues that section 355, subdivision (c)(1)(C) requires that the peace officer's statement be in the form of a declaration under penalty of perjury as set forth in Code of Civil Procedure section 2015.5. A.M. does not cite any authority for this proposition, and we decline to conclude this is required. Just as there is no such requirement under section 355, subdivision (c)(1)(C) as to statements made by social worker "declarants," we conclude that peace officer statements likewise need not be made under penalty of perjury in a declaration in order for the hearsay exception to apply.

Although the authors of the police reports were not present in court, Markelz did not subpoena the authors, nor did he request a continuance to do so. Markelz was provided with copies of the police reports before the day of the hearing and should have been aware that minors' counsel intended to enter into evidence and rely on the police reports at the contested jurisdiction/disposition hearing.

36

Under these circumstances, we conclude the juvenile court did not abuse its discretion in admitting into evidence the police reports and relying on hearsay contained in the reports during the jurisdiction/disposition hearing. Furthermore, as the juvenile court stated, there was sufficient evidence to support jurisdiction and removal of the Children based on other evidence in the record, including the CFS reports and testimony by the maternal uncle, A.M., and the social workers.

V.

SUFFICIENCY OF THE EVIDENCE

A.M. argues there was insufficient evidence to support the juvenile court's jurisdiction and disposition orders. We disagree.

"In dependency proceedings, the social services agency has the burden to prove by a preponderance of the evidence that the minor who is the subject of the dependency petition comes under the juvenile court's jurisdiction." (*In re Isabella F.* (2014) 226 Cal.App.4th 128, 137 (*Isabella F.*); see also § 355, subd. (a).) We review the juvenile court's findings for substantial evidence. (*In re A.L.* (2017) 18 Cal.App.5th 1044, 1049 (*A.L.*).) "In so doing, we view the evidence in the light most favorable to the juvenile court's order, bearing in mind that, while substantial evidence may consist of inferences, inferences which are the result of speculation cannot support a finding." (*Ibid.*; see also *Isabella F.*, *supra*, 226 Cal.App.4th at pp. 137-138.) The parent has the burden on appeal of showing there is insufficient evidence to support the juvenile court's order. (*Isabella F.*, *supra*, at p. 138.)

The juvenile court found true the dependency petition allegation that A.M. violated section 300, subdivision (b)(1), which states the child suffered or is at substantial risk of suffering serious physical harm or illness as a result of the parent's failure to adequately supervise or protect the child, or willful or negligent failure to provide the child with food, clothing, shelter, or medical treatment. This provision "authorizes dependency jurisdiction without a finding that a parent is at fault or blameworthy for her failure or inability to supervise or protect her child." (*In re R.T.* (2017) 3 Cal.5th 622, 624.) The issue under section 300, subdivision (b)(1), is whether circumstances at the time of the hearing were such that the Children were subject to the defined risk of harm. (*In re Rocco M.* (1991) 1 Cal.App.4th 814, 824.)

A.M. asserts there was insufficient evidence to support the juvenile court's jurisdiction and dispositional orders because the CFS reports, police reports, and Roldan declaration were inadmissible, the only evidence the juvenile court could consider was the testimony of Williams, Castaneda, and A.M. A.M. also argues as to the disposition order that there was insufficient evidence that reasonable efforts were made to prevent or eliminate the need for removal of the Children. A.M. further argues she did everything CFS asked of her and even more to prevent the need for removal of the Children.

We reject A.M.'s argument that she had the right to discipline the Children, and this included the right to lock J.G. in the garage room, which was used as a discipline room and as J.G.'s bedroom. An abundance of evidence shows that the garage room was a small, cold, makeshift storage room in the garage. A.M. locked J.G. in the room for

38

several hours and even left her there overnight on numerous occasions. A.M. testified she could not hear J.G. when she was in the garage room, supporting a finding of inadequate supervision and protection.

A.M. did not have access to a bathroom while locked in the garage room. There was only a child's training potty in the room. Deputy Vega, dispatched to the home on January 16, 2022, found the potty full or urine and fecal matter, indicating J.G. had been locked in the room for a substantial amount of time. In addition to the garage room smelling like human waste, it smelled like a dead animal and there were mice droppings in the room.

There also was evidence that J.G. had been required to sleep overnight in the room during the past three months, if not longer. A.M.'s other children viewed the garage room as J.G.'s bedroom. In addition, there was evidence J.G. was under-fed, and A.M. disfavored and neglected J.G. Although A.M. had attended parental training courses, which were required for her to become a foster parent, she nevertheless failed to use proper discipline methods by isolating J.G. in a locked garage room for lengthy periods of time, including overnight, with no supervision, human contact, or freedom to use the bathroom or have access to inside A.M.'s home.

A.M. argues there is no evidence that A.M. physically harmed J.G. or her siblings. But the court "need not wait until the child is seriously abused or injured to assume jurisdiction" under section 300, subdivision (a)." (*In re N.M.* (2011) 197 Cal.App.4th at p. 159; *Isabella F.*, *supra*, 226 Cal.App.4th at p. 138.) A.M. further asserts that "it does

39

not matter" if others do "not like" the manner in which she disciplined and treated J.G. by locking her in the garage room, "so long as it did not place J.G. at significant risk of suffering serious physical harm or illness as [a] result of [A.M.'s] failure to adequately supervise or protect J.G." We disagree. Such treatment of J.G. was not "reasonable and age-appropriate" discipline, under any stretch of the imagination, within the meaning of section 300. (§ 300, subd. (a).)

Substantial evidence demonstrates that it does matter, because A.M.'s treatment of J.G. was not only inappropriate, but abusive and cruel. A.M. subjected J.G., a seven-year-old child, to the risk of suffering serious physical harm or illness as a result of A.M. failing to adequately supervise and protect J.G. A.M. left J.G. locked in a makeshift garage room, including overnight; J.G. had no way of communicating with anyone; she had no access to a bathroom, food, or human contact; and A.M. had no means of seeing or hearing her. Under such circumstances, there was substantial evidence supporting the juvenile court's finding that there was a significant risk that J.G. and her younger siblings, D.G. and L.G., would in the future suffer harm if returned to A.M.'s care, particularly if they misbehaved.

A.M. argues that in other cases, such as *A.L.*, *supra*, 18 Cal.App.5th at page 1046, and *Isabella F.*, *supra*, 226 Cal.App.4th at page 131, the court found significantly worse parental conduct not sufficient to establish jurisdiction or removal. *A.L.* and *Isabella F.* are distinguishable and do not involve significantly worse parental conduct. They thus do

not support this court holding that the juvenile court abused its discretion when finding jurisdiction and ordering removal of the Children from A.M.

In *A.L.*, the mother appealed and the appellate court reversed the juvenile court's jurisdictional findings made under section 300, subdivision (b)(1), regarding her 15-year-old son, A.L., and 11-year-old daughter, J.L. (*A.L.*, *supra*, 18 Cal.App.5th at p. 1046.) In *A.L.*, during an isolated incident, the mother had a manic episode during which she threw a shoe which unintentionally hit J.L. on her head or arm. J.L. was not injured, nor was A.L. ever harmed when he intervened during his parents' arguments by sitting between them in an effort to curb the mother's anger.

The court in *A.L.* concluded that, although the juvenile court was entitled to evaluate past events, as they may be predictive of future dangers, there was not substantial evidence supporting findings that the father failed to protect the children from the mother's conduct or that the mother's mental illness created a substantial risk of physical harm to the children in the future, as required by section 300, subdivision (b)(1). (*A.L.*, *supra*, 18 Cal.App.5th at pp. 1049-1050.)

The *A.L.* court explained that the incident leading to the referral was the first time the family had sought assistance from law enforcement, and it occurred after the mother stopped taking her medication. No one was injured and the father acted quickly to obtain appropriate help, after which the mother was placed in a psychiatric facility until her condition could be stabilized. Once she left the facility, the mother resumed taking her medication. In addition, the evidence showed that the children were well cared for in

41

spite of the mother suffering from mental illness. They loved their mother and wanted her back in the home. (*A.L.*, *supra*, 18 Cal.App.5th at p. 1050.)

The *A.L.* court further noted that the children were not youngsters and were well aware of their mother's mental illness. A.L. knew what to do when his mother was in a manic state, and during the incident leading to the referral, his maturity and experience allowed him to help deescalate the situation. The *A.L.* court therefore concluded the juvenile court erred in asserting jurisdiction over these children, because the juvenile court's intervention was not needed. There was no reason to believe that the father and the family would be unable to safely handle any future problems. (*A.L.*, *supra*, 18 Cal.App.5th at p. 1050.)

*A.L.*, *supra*, 18 Cal.App.5th 1044, is distinguishable for a number of reasons. First, in *A.L.*, the mother's conduct leading to the referral was the first time law enforcement had intervened. The incident was the result of the mother not taking her medication for her mental illness. Thereafter, the mother resumed taking her medication, and stabilized The children were well cared for in spite of their mother suffering from mental illness, were older (11 and almost 16 years old), and they and their father knew how to effectively address the mother's mental illness condition. In addition, the children wanted their mother to return home.

Unlike in *A.L.*, here, J.G. did not want to return to A.M.'s home, and the incident leading to the Children's removal was not an isolated incident. A.M. had been repeatedly locked J.G. in the garage room, had not been feeding her adequately, and had not

properly supervised her for at least three months. Substantial evidence established that A.M. failed to adequately supervise and protect J.G. on multiple occasions, not merely once during an aberrational "isolated incident." Repeated past instances of abuse are relevant to the court's determination of whether a child presently needs the court's protection. (*In re N.M.*, *supra*, 197 Cal.App.4th at p. 165.) "'[A] measure of a parent's future potential is undoubtedly revealed in the parent's past behavior with the child.'" (*In re Jasmon O.* (1994) 8 Cal.4th 398, 424)

In addition, J.G. and her siblings were younger than the *A.L.* children and thus at greater risk of being harmed by A.M. in the future, particularly if the Children misbehaved. There was evidence that, even after the Children were removed from A.M., she continued to use inappropriate disciplinary measures, such as continuing to isolate and separate the Children. Although A.M. had dismantled the garage room, there was still the risk she would resort to harmful disciplinary practices in the future because she had not demonstrated she had learned to use other effective forms of discipline. In addition A.M. had not provided proof she completed any parenting courses after the dependency proceedings were initiated.

A.M.'s reliance on *Isabella F.*, *supra*, 226 Cal.App.4th 128, for the proposition there was insufficient evidence to support the jurisdiction and removal orders is also misplaced. In *Isabella F.*, the mother became physical with 10 year-old Isabella when she resisted getting ready for school. The mother reportedly hit Isabella in the face, grabbed her by the neck, and locked her in the bathroom. Isabella told the social worker

this was the first time something like this had happened, and said she was afraid of mother.  (*Id*. at pp. 131-132, 133.)

The mother in *Isabella F.* told the social worker that Isabella had a "'really bad tantrum'" and admitted to trying to spank her and pulling her into the bathroom.  The mother denied hitting Isabella in the face but acknowledged that her response had been inappropriate and she "should have taken another approach to the situation."  (*Isabella F.*, *supra*, 226 Cal.App.4th at p. 132.)  The social service agency filed a petition seeking jurisdiction under section 300, subdivision (a) (nonaccidental infliction or risk of infliction of serious physical harm), as to the mother.  The next day, the social worker and the social service agency's lawyer recommended Isabella be returned to the mother's care because they believed Isabella would be at greater risk in foster care.  The court agreed.  (*Isabella F.*, *supra*, at pp. 132-133.)

At the jurisdiction hearing, the mother's attorney argued that the section 300, subdivision (a) allegation (nonaccidental infliction of serious physical harm) should be dismissed because Isabella had not suffered serious physical harm.  The mother's attorney "stopped short of asking the juvenile court to dismiss the petition, apparently based on mother's desire to receive services."  The juvenile court therefore sustained the petition allegations under section 300, subdivision (a), as to the mother, "focusing on the benefits of reunification services, as opposed to any harm Isabella had suffered."  (*Isabella F.*, *supra*, 226 Cal.App.4th at p. 135.)

The court of appeal in *Isabella F.* reversed the findings that substantial evidence supported jurisdiction under section 300, subdivision (a) because Isabella had not suffered "serious physical harm" during the incident, which was isolated and not part of a pattern of repeated abuse. (*Isabella F.*, *supra*, 226 Cal.App.4th at pp. 138-139.) The court in *Isabella F.* also found that there was no evidence that Isabella was at substantial risk of further serious harm. (*Ibid.*) The court noted that the "primary motivating factor in declaring jurisdiction appears to have been to offer mother services," and found that "these good intentions are an insufficient basis upon which to find jurisdiction under section 300, subdivision (a)." (*Id.* at p. 139.)[9]

The court in *Isabella F.* primarily discusses jurisdiction under subdivision (a) of section 300, which is relevant to the extent both subdivision (a) and (b) require a finding the child has suffered or is at substantial risk of suffering serious physical harm. Subdivision (b) differs from subdivision (a) in that (b) does not require such harm to be nonaccidental, and the applicable provision, subdivision (b)(1), requires the finding of substantial risk of serious physical harm to be based on failure or inability to adequately supervise or protect the child. (*Isabella F.*, *supra*, 226 Cal.App.4th at pp. 139-140.)

---

[9] The juvenile court in *Isabella F.*, also found jurisdiction as to the father under section 300, subdivision (b) (failure to protect). The father, who was not a party to the appeal, could not be located and Isabella had not had any contact with him for more than two years before the filing of the dependency petition. The court in *Isabella F.* found that, although the father had previously been placed on involuntary psychiatric hold because of mental health issues over two years before the dependency proceedings were filed, there was no basis for finding jurisdiction under section 300, subdivision (b). (*Isabella F.*, *supra*, 226 Cal.App.4th at p. 140.)

45

*Isabella F.* is distinguishable because the allegations against the mother were not based on her failure to supervise or protect the child under section subdivision (b)(1). Jurisdiction was brought under subdivision (a). In *Isabella F.*, unlike here, there was no evidence of any pattern of similar incidents. (*Isabella F.*, *supra*, 226 Cal.App.4th at p. 139.) The court in *Isabella F.* recognized that "section 300, subdivision (a) may apply when a minor suffers less serious injuries but there is a history of repeated abuse." (*Isabella F.*, *supra*, at p. 139, citing *In re N.M.*, *supra*, 197 Cal.App.4th at pp. 162-163, 169 [although the father did not injure his daughter when he started to drive away his truck while she was reaching into the cargo area, the incident was part of larger pattern of physical abuse].)

In addition, unlike in the instant case, the court in *Isabella F.* found there was insufficient evidence of there being a substantial risk the child would suffer serious physical harm in the future, primarily because jurisdiction was based on an isolated incident, and there was no evidence supporting a finding the mother would commit the same type of conduct again. (*Isabella F.*, *supra*, 226 Cal.App.4th at p. 139.) Also, unlike in this case, the *Isabella F.* court concluded the juvenile court improperly based jurisdiction primarily on the inappropriate rationale that the mother needed services, which would not be provided if jurisdiction was not granted. (*Isabella F.*, *supra*, at p. 139.)

Although in the instant case, mother removed the room in the garage and acknowledged she believed she should not have placed J.G. in the garage room, there was

also evidence that mother minimized her conduct and still had not learned how to properly discipline her children.  Under such circumstances, unlike in *Isabella F.* and *A.L.*, there is substantial evidence supporting the juvenile court's findings that J.G. and her siblings faced substantial risk of serious future harm, justifying findings of jurisdiction under section 300, subdivision (b), and removal.

## VI.

## DISPOSITION

The juvenile court's June 6, 2022, jurisdiction and disposition orders are affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

CODRINGTON

J.

We concur:

McKINSTER
Acting P. J.

MILLER
J.