Filed 7/16/24  In re V.S. CA1/5

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION FIVE

| | |
|---|---|
| In re V.S., a Person Coming Under the Juvenile Court Law. | |
| MARIN COUNTY HEALTH AND HUMAN SERVICES,<br><br>    Plaintiff and Respondent,<br>v.<br>R.S.,<br><br>    Defendant and Appellant. | A168829 & A169488<br><br>(Marin County<br>Super. Ct. No. JV26726A) |

R.S. (Mother) appeals from the juvenile court's orders placing Mother's daughter, V.S. (Minor), with the paternal grandparents, and subsequently terminating Mother's parental rights.  We reject the challenges.

BACKGROUND[1]

*"Prior Dependency Proceeding*

"In October 2018, Marin County Health and Human Services (the Department) filed a [Welfare and Institutions Code[2]] section 300 petition on behalf of [Minor, then two months old]. The petition alleged Mother 'has a longstanding history of alcohol abuse and has been unable to maintain sobriety for more than a very short period when outside of a residential treatment program.' The Department stated Mother was 'charming, smart, capable and a very good mother when she is sober,' but there had already been multiple incidents of Mother drinking to excess while caring for Minor. Mother had been to treatment about five times in her life.

"Mother submitted to jurisdiction and the juvenile court ordered reunification services. Mother received 15 months of reunification services, during which time she relapsed three times. In February 2020, Mother had been sober for six months and Minor was returned to her care. Mother received an additional five months of family maintenance services before dependency was dismissed in July 2020 with custody to Mother.

*"Current Dependency Proceeding*

"In October 2022, the Department filed the underlying dependency petition, alleging Mother had relapsed multiple times since the termination of the prior proceeding.

---

[1] Much of the relevant background was set forth in an opinion on a previous appeal, which we quote at length here. We omit background facts regarding Minor's father, who is deceased.

[2] All undesignated statutory references are to the Welfare and Institutions Code.

2

"The Department reported Mother first relapsed in the fall of 2020, while living in New York. In December 2020, a New York court granted temporary custody of Minor to the paternal grandmother. Mother entered treatment, and in the fall of 2021, Minor was returned to Mother's care. In June 2022, Mother relapsed again. In September, Mother left Minor with the maternal grandmother in Marin County and entered a treatment program in Pennsylvania. After the maternal grandmother left Minor with the maternal grandfather, who was in recovery and relapsed while caring for Minor, the juvenile court ordered Minor detained and placed in foster care.

"In late November 2022, the juvenile court sustained the petition and ordered reunification services to Mother, including substance abuse and mental health services. That month, Mother began drinking daily while residing in a Marin County sober living home, but initially was able to conceal the relapse. In December, she was discharged from the sober living home after staff searched her room and found empty wine bottles and numerous empty nitrous oxide cannisters. In early January 2023, Mother told the Department she was staying with her boyfriend in New York. While out of state, Mother did not engage in services and did not test, despite multiple testing appointments arranged by the Department. She later told the Department she was drinking heavily throughout this period, and also drove drunk and used cocaine.

"In late February 2023, Mother returned to Marin County and entered residential treatment. . . . [¶] In May 2023, shortly before the six-month review hearing, the Department filed a section 388 petition requesting the court terminate reunification services and set a section 366.26 hearing. . . . [¶] . . . [¶] Following the contested hearing [on July 13], . . . [t]he court terminated reunification services and set a section 366.26 hearing." (*R.S. v.*

*Superior Court of Marin County,* Oct. 18, 2023, A168434.)  This court denied Mother's writ petition challenging the order.  (*Ibid.*)

Shortly thereafter, an evidentiary hearing was held on a section 388 petition filed by the paternal grandparents requesting Minor be placed with them in New York, where they live.[3]  On July 25, 2023, the juvenile court issued a written order granting the paternal grandparents' request for placement.  Mother appeals from this order (case No. A168829).

In advance of the November 2023 section 366.26 hearing, the Department filed a report recommending the juvenile court terminate Mother's parental rights and set a permanent plan of adoption.  On November 7, Mother requested a bonding study, which the juvenile court denied.  On November 16, following the contested section 366.26 hearing, the juvenile court terminated Mother's parental rights and set a permanent plan of adoption.  Mother appeals from this order (case No. A169488) and we consolidated the two appeals.

DISCUSSION

I.    *Placement With Paternal Grandparents*

Mother appeals the juvenile court's order placing Minor with the paternal grandparents.  We find Mother lacks standing to appeal this order.

To determine whether a parent has standing to appeal a juvenile court's placement order, a court must "precisely identify [the parent's] interest in the matter. . . . [A]fter reunification services are terminated or bypassed . . . , 'the parents' interest in the care, custody and companionship of the child [is] no longer paramount.  Rather, at this point "the focus shifts to the needs of the child for permanency and stability . . . ." ' [Citation.]  For

_____

[3] The section 388 petition was filed in April 2023, but the evidentiary hearing was continued to follow the six-month review hearing.

4

this reason, the decision to terminate or bypass reunification services ordinarily constitutes a sufficient basis for terminating parental rights. (§ 366.26, subd. (c)(1).)  A few statutory exceptions to this rule permit the juvenile court not to terminate parental rights when compelling reasons show termination would be detrimental to the child.  (*Id.*, subd. (c)(1)(B)(i)-(vi).)" (*In re K.C.* (2011) 52 Cal.4th 231, 236–237.)  Therefore, "[a] parent's appeal from a judgment terminating parental rights confers standing to appeal an order concerning the dependent child's placement only if the placement order's reversal advances the parent's argument against terminating parental rights."[4]  (*Id.* at p. 238.)  For example, a parent may have standing to appeal an order *removing* a child from a relative placement because "[t]he placement of a dependent child with relatives can, under certain circumstances, make the termination of parental rights unnecessary. (§ 366.26, subd. (c)(1)(A).)"  (*Id.* at p. 237.)

Mother argues the placement decision impacted her ability to present evidence supporting the parental-benefit exception to adoption (see *post,* part III) because her visits with Minor were reduced to twice per month and changed from in-person to virtual.  Minor's placement with the paternal grandparents began in mid-August 2023, only three months before the contested section 366.26 hearing.  The juvenile court had years of visitation reports before it, including lengthy excerpts from in-person visit reports for January to July 2023, set forth in the Department's section 366.26 report; as well as reports from the Court-Appointed Special Advocate (CASA) describing in-person visits in the spring and summer of 2023, submitted by Mother at the section 366.26 hearing.  Mother fails to explain how having more frequent

---

[4] Mother concedes this standard applies to her appeal from the placement order.

and in-person visits during the final three months could have materially impacted the parental-benefit exception determination. (See *In re Richard C.* (1998) 68 Cal.App.4th 1191, 1196 ["The kind of parent-child bond the court may rely on to avoid termination of parental rights under the [parental-benefit exception] does not arise in the short period between the termination of services and the section 366.26 hearing."].)

Mother also contends that, even though the foster family Minor was placed with before the challenged placement order wanted to adopt Minor, "they were so supportive of [Minor] continuing her relationship with [Mother], that they may have ultimately opted for a legal guardianship" had Minor's placement not been changed to the paternal grandparents. Mother provides no record support for this sheer speculation, which is not sufficient to establish standing. (*In re Valerie A.* (2007) 152 Cal.App.4th 987, 1000 [standing not established where "[a]ny prejudicial effect on [the appellant's] interest in these proceedings is merely speculative"].)

Finally, Mother argues the placement decision may have impacted the juvenile court's order on the bonding study because Minor's New York location "increase[d] the difficulty of obtaining a bonding study"; decreased the efficacy of any such study because of the necessity that it be conducted virtually; and, "given the [paternal] grandparents vitriol towards the mother, the court may have believed that a bonding study taking place after [Minor] was moved to New York would only add to the tension." As discussed below (*post,* part II), the court's primary reason for denying Mother's bonding study request was the presence of ample evidence on Minor and Mother's relationship already in the record. This reason is not even tangentially related to the difficulty or efficacy of a bonding study given Minor's out-of-state placement or the potential for increasing tension between Mother and

the paternal grandparents, and there is therefore no basis to find the placement decision had any impact on this ruling.

Because Mother lacks standing to challenge the placement order, we will dismiss this appeal.

II.    *Bonding Study*

Mother contends the juvenile court abused its discretion in denying her request for a bonding study.  We disagree.

On November 7, 2023, the initial date set for the section 366.26 hearing, Mother requested a bonding study.[5]  Following argument, the court denied the request, reasoning: "I'm aware of the bonding studies and what they are and what they do.  I'm aware in such cases it's suggested it's a good idea.  Frankly, in this particular case, I don't think it's necessary.  [Minor] has been involved with this Court for a lot of years, and we've had a lot of contested hearings.  I've heard a lot of testimony.  I've read a lot of reports.  And in this particular case, [Minor] has not been in mother's care for the majority of her life.  So I don't feel like this is a case that -- that would particularly help this Court.  I'm aware of the very strong feelings by mother.  I'm aware of strong feelings by [the] prior resource family.  And I have read . . . the CASA reports.  But in this particular case, I don't think a further delay [for] a bonding study is going to serve this Court or [Minor], frankly.  So I'm going to decline the request for the bonding study under those circumstances."

"[E]xpert psychologists who have observed the child and parent and can synthesize others' observations will be an important source of information

---

[5] Mother previously requested a bonding study in May 2023, prior to the termination of reunification services.  The record does not disclose a ruling on this request.

about the psychological importance of the relationship for the child," and therefore "courts should seriously consider, where requested and appropriate, allowing for a bonding study or other relevant expert testimony." (*In re Caden C.* (2021) 11 Cal.5th 614, 632–633 & fn. 4.) However, " '[t]here is no requirement in statutory or case law that a court must secure a bonding study as a condition precedent to a termination order.' " (*In re Richard C., supra,* 68 Cal.App.4th at p. 1195.) "Bonding studies after the termination of reunification services would frequently require delays in permanency planning. . . . [T]he denial of a belated request for such a study is fully consistent with the scheme of the dependency statutes, and with due process." (*Id.* at p. 1197.) An order denying a bonding study is reviewed for abuse of discretion; in other words, "whether, under all the evidence viewed in a light most favorable to the juvenile court's action, the juvenile court could have reasonably refrained from ordering a bonding study." (*In re Lorenzo C.* (1997) 54 Cal.App.4th 1330, 1341.)

Mother asserts the juvenile court could not decide whether the parental-benefit exception applied without a bonding study, but fails to explain why it was unreasonable for the court to determine that its years-long experience with the case was sufficient. Mother also fails to address the court's concern about the delay that would result from granting the request. Mother has not established an abuse of discretion. Mother's contention that the bonding study denial violated her due process rights is similarly unavailing. (*In re Richard C., supra,* 68 Cal.App.4th at p. 1197.)

III. *Parental-Benefit Exception*

Mother argues the juvenile court erred in finding the parental-benefit exception to adoption did not apply. We affirm.

"Even when a court proceeds to select a permanent placement for a child who cannot be returned to a parent's care, the parent may avoid termination of parental rights in certain circumstances defined by statute. One of these is the parental-benefit exception. What it requires a parent to establish, by a preponderance of the evidence, is that the parent has regularly visited with the child, that the child would benefit from continuing the relationship, and that terminating the relationship would be detrimental to the child. (See Welf. & Inst. Code, § 366.26, subd. (c)(1)(B)(i); Evid. Code, § 115.) The language of this exception, along with its history and place in the larger dependency scheme, show that the exception applies in situations where a child cannot be in a parent's custody but where severing the child's relationship with the parent, even when balanced against the benefits of a new adoptive home, would be harmful for the child. While application of the beneficial parental relationship exception rests on a variety of factual determinations properly reviewed for substantial evidence, the ultimate decision that termination would be harmful is subject to review for abuse of discretion." (*In re Caden C., supra,* 11 Cal.5th at pp. 629–630.)

A.    *Additional Background*

In an October 25, 2023 report filed in advance of the section 366.26 hearing, the Department recommended the juvenile court terminate Mother's parental rights and set adoption as Minor's permanent plan. Minor's placement with her paternal grandparents in New York had begun in mid-August. Minor was "thriving," "meeting all her developmental milestones," and had "a lovely relationship" with the paternal grandparents and a paternal aunt who also lived in the home.

Mother had regularly visited Minor in-person before the move to New York and by video after the move. The visits were positive and Minor enjoyed

9

them, but Minor was able to leave "without emotional disruption, and seems to accept that she has visits with this loving visitor who is her mother, who she loves, but is able to detach from at the end of the visits without incident or questions about when she can return to the care of her mother." The Department stated Minor's relationship with Mother "can be best described as a loving visitor." The report included pages of excerpts from detailed visitation notes from 2023 visits.

The Department noted Minor had spent "more than half her life . . . out of her mother's care" and the periods "[Minor] spent in care of her mother were fragmented timeframes . . . ." It concluded, with respect to the parental-benefit exception, "[Minor] deserves to have stability and love that is consistent over time and not sporadic and reliant on an adult who is struggling with an addiction to the degree that it compromises the care of [Minor]. Anything short of an adoption, could leave [Minor] and her paternal grandparents vulnerable to future legal and/or emotional disruption. This occurred one time already, when [Mother] [went] to New York Family Court for and was granted return of [Minor] from her paternal grandparents care back to her care. [Mother] shortly thereafter relapsed again . . . . [Minor] can grow up with her paternal relatives and have shared life memories with her biological family. They love her dearly and want to give her a good, stable life. While [Minor] does have a relationship with [Mother], it is unpredictable and inconsistent. The relationship is not so strong that it outweighs all the benefits that she would gain from being adopted by her paternal relatives."

In a November 13, 2023 addendum report filed in advance of the continued section 366.26 hearing, the Department provided updated information about video visits, including one where Mother left the screen when Minor went to the bathroom and, when Mother returned, the

supervising social worker noticed Mother was noticeably breathing faster than normal, her eyes were closing, and Mother soon disconnected from the video visit. The Department reiterated its recommendation that that juvenile court terminate parental rights and set a permanent plan of adoption. Minor's counsel agreed with this recommendation.

The contested hearing was held on November 16, 2023. Mother did not cross-examine the Department social worker or any other Department representative. Mother submitted CASA reports from 2023 and a 2023 report from Minor's former foster parents. The CASA also provided an informal update about a recent video visit where Minor showed the CASA a card and told her, unprompted, that the card was for Mother.

The maternal grandmother testified that Minor lived with her for most of the first year of Minor's life, for around six months with Mother when Minor was two years old, and for a couple of months when Minor was three or four years old. At the time of the hearing, the maternal grandmother had not seen or spoken with Minor for over a year. The maternal grandmother testified she had seen Mother being playful with Minor, cooking for her, and setting appropriate boundaries. Minor turned to Mother for help and reassurance. Mother was "the one constant" in Minor's life. On cross-examination, the maternal grandmother clarified, "there's a big difference between sober [Mother] and intoxicated [Mother], and when I talk about the good cook, when I talk about the good mother, it's sober [Mother]."

Minor's foster father from January 2023 through the summer of 2023 testified that Minor was wary of him at first, but warmed up to him after she saw him interacting with Mother. The former foster father attributed this to Minor looking to Mother for guidance: "If these people are all right with you then they're going to be all right with me." Minor would ask about Mother,

said she missed Mother, called Mother "mom" and "mommy," and was excited and enthusiastic about visits with Mother. On cross-examination, he conceded that Minor also called her former foster mother "mom" and "mommy"; and that, in March 2023, he told the Department Minor did not talk about Mother much, did not want to leave the car for her first in-person visit with Mother that month, and was dysregulated before and after visits with Mother.

Mother testified about the timeline of her and Minor's living situations over the years, her parenting of Minor when Minor lived with her, and her visits when Minor did not. Mother testified she and Minor "always had a very very special bond . . . and I think that she will be forever devastated if she doesn't return to me, and I understand that's not really what's in question right now, but to never see me again, that is my biggest fear [for Minor], and I don't think that she would be able to wrap her head around it, especially with her father being gone, too."

The juvenile court issued a written order terminating Mother's parental rights. With respect to the parental-benefit exception, the court found Mother had established the first prong, regular visitation. As for the benefit to Minor from continuing the relationship, the court found, "the interactions between Mother and [Minor] are calm and engaged. [Minor] does not show any signs of distress when separating from Mother at the conclusion of the visits, has lived with Mother sporadically and briefly[6], and their visits have not progressed since last year. While this may be a loving

---

[6] After reviewing the timeline of Minor's placements, the juvenile court found, "Overall [Minor] has lived with Mother for six weeks in 2018, zero weeks in 2019, 3-4 months in 2020, four months in 2021, and six months in 2022. A total of 15.5 months. [Minor] is 5. She has been in Mother's care for about 25% of her life in relatively short stints." (Footnote omitted.)

and affectionate relationship, the evidence is reflective of the 'incidental benefit' that interaction between natural parent and child will always confer. [Citation.] It is not the 'substantial, positive, emotional attachment to the parent['] required by the exception." In finding termination of the relationship would not be detrimental to Minor, the juvenile court found it was "not a difficult decision": to place Minor with the paternal grandparents in a guardianship "would render [Minor's] custody [open] to ongoing challenges and the [paternal grandparents] would undoubtedly face another challenge to the guardianship in New York . . . with a court without this court's historical context. [¶] . . . A guardianship simply will not provide a permanency for [Minor]. The crazy merry-go-round of [Minor's] life cannot keep going."

B.     *Analysis*

Mother argues the juvenile court erred in its analysis of the benefit to Minor of continuing the relationship with Mother. Mother focuses on a statement by the court that there was no "evidence of day-to-day interactions" or significant "history of day-to-day care." Mother argues this consideration was erroneous, relying on *In re S.B.* (2008) 164 Cal.App.4th 289, 300, which held, "Neither section 366.26, subdivision (c)(1)(B)(i), nor [*In re*] *Autumn H.* [(1994) 27 Cal.App.4th 567] requires proof that . . . the noncustodial parent has maintained day-to-day contact with the child." *In re S.B.* does not hold that an absence of day-to-day contact is never relevant to the analysis. (See also *In re Caden C., supra,* 11 Cal.5th at p. 632 ["the [parent-child] relationship may be shaped by a slew of factors"].) In *In re S.B.*, the father was the minor's "primary caregiver for three years" and, after the minor was detained because of the parents' drug use, the father "immediately recognized that his drug use was untenable, started services,

13

maintained his sobriety, sought medical and psychological services, and maintained consistent and regular visitation with [the minor]. He complied with 'every aspect' of his case plan" and "visited [the minor] three days a week," but acknowledged that "health problems impeded his ability to care for [the minor] full time." (*In re S.B.,* at pp. 293–294, 298.) On these facts, and evidence of the minor's attachment to the father, the Court of Appeal held the juvenile court's finding that the father did not have a parental relationship with the minor lacked substantial evidence. (*Id.* at p. 298.) No such facts are present here. Ample evidence supported the juvenile court's finding that Minor did not have a sufficiently substantial attachment to Mother to warrant application of the parental-benefit exception.

Mother also relies on *In re B.D.* (2021) 66 Cal.App.5th 1218, in which the Court of Appeal remanded the juvenile court's rejection of the parental benefit exception because "the juvenile court considered improper factors" in considering the minors' relationship with the parents. (*Id.* at p. 1230.) Mother points to the court's observation that "the record suggests that the parents presented evidence to support a finding that they had a beneficial relationship with their children, should the juvenile court credit that evidence," including reports that the minors looked forward to visits with the parents and were happy to see them. (*Id.* at p. 1229 & fn. 4, italics added.) *In re B.D.* did not hold that such evidence either must be credited or required a finding of substantial benefit.

Mother contends there was evidence of Minor's strong emotional attachment to and reliance on Mother. Even so assuming, this alone does not render the court's finding lacking in substantial evidence. (*In re Caden C., supra,* 11 Cal.5th at p. 640 ["[Factual] determinations should 'be upheld if . . . supported by substantial evidence, even though substantial evidence to the

14

contrary also exists and the trial court might have reached a different result had it believed other evidence.' "].)

Finally, Mother argues the juvenile court abused its discretion in determining termination of parental rights would not be detrimental to Minor. Mother contends, "it is clear that [Minor's] relationship with her mother was a very important one to her and that she was emotionally reliant on the relationship." Mother's recitation of evidence arguably supporting this proposition does not establish the juvenile court abused its discretion. (*In re Caden C., supra,* 11 Cal.5th at p. 641 ["A court abuses its discretion only when ' " 'the trial court has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination.' " ' [Citation.] But ' " '[w]hen two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court.' " ' "].) While conceding that a guardianship could be subject to a future challenge, Mother nonetheless claims that potential risk was outweighed by the benefit of maintaining a relationship with Mother. The juvenile court did not abuse its discretion in determining otherwise. (*Ibid.*)

IV. *ICWA*

Finally, Mother argues the Department and the juvenile court failed to conduct adequate inquiry regarding Minor's Indian ancestry as required by the Indian Child Welfare Act (ICWA; 25 U.S.C. § 1901 et seq.).[7] We disagree.

"To determine whether ICWA applies to a dependency proceeding, the juvenile court and [the Department] have 'an affirmative and continuing duty

---

[7] "[B]ecause ICWA uses the term 'Indian,' we do the same for consistency, even though we recognize that other terms, such as 'Native American' or 'indigenous,' are preferred by many." (*In re Benjamin M.* (2021) 70 Cal.App.5th 735, 739, fn. 1.)

15

to inquire whether a child for whom a petition under Section 300 . . . may be or has been filed, is or may be an Indian child.' (§ 224.2, subd. (a).)  This duty to inquire consists of two phases—the duty of initial inquiry and the duty of further inquiry.  [Citation.] . . . Once a child is taken into temporary custody, the duty of initial inquiry includes asking the child, parents, legal guardian, extended family members, and others who have an interest in the child whether the child is or may be an Indian child.  (§ 224.2, subd. (b); § 306, subd. (b).)  Extended family members include adults who are the child's stepparents, grandparents, aunts, uncles, brothers, sisters, nieces, nephews, or first or second cousins.  (25 U.S.C. § 1903(2); []§ 224.1, subd. (c).)  The juvenile court must ask each participant at the first appearance 'whether the participant knows or has reason to know that the child is an Indian child,' and the court must 'instruct the parties to inform the court if they subsequently receive information that provides reason to know the child is an Indian child.' (§ 224.2, subd. (c); see 25 C.F.R. § 23.107(a) (2022).)" (*In re Dominick D.* (2022) 82 Cal.App.5th 560, 566.)[8]  "A juvenile court's finding that ICWA does not apply implies 'that social workers had fulfilled their duty of inquiry.' [Citation.]  'We review a court's ICWA findings for substantial evidence.' " (*Id.* at p. 567.)

Mother does not challenge the adequacy of the inquiry with respect to the paternal family or with respect to her personally, nor does she contend there was reason to believe Minor was an Indian child.  Instead, Mother's sole argument is there is insufficient evidence the Department or juvenile

---

[8] "If the initial inquiry gives the juvenile court or [child welfare agency] 'reason to believe that an Indian child is involved in a proceeding,' then 'further inquiry regarding the possible Indian status of the child' must be made.  (§ 224.2, subd. (e).)" (*In re Dominick D., supra,* 82 Cal.App.5th at p. 566.)

court asked the maternal grandparents about Minor's possible Indian ancestry. Mother concedes that a Department report from the current dependency proceeding represents, "In the prior case involving [Minor], the maternal grandparents . . . stated they are not members or citizens of an American Indian tribe or Alaska Native Village." However, Mother argues this is insufficient to satisfy the inquiry obligation.

Mother first contends the statement in the Department report is insufficient because there is no contemporaneous documentation of such an inquiry in the Department reports from the prior dependency proceeding. The Welfare and Institutions Code "authorize[s] the admission of a social worker's report—including hearsay in the report—in any dependency proceeding." (*In re M.B.* (2011) 201 Cal.App.4th 1057, 1071, italics omitted.) The statement in the Department's report about the inquiry of the maternal grandparents was therefore admissible evidence. Mother fails to provide authority that "the presumption in Evidence Code section 664 that official duty has been regularly performed" (*In re S.B.* (2009) 174 Cal.App.4th 808, 812–813) is rebutted by the absence of contemporaneous documentation in prior reports. We note that, for the first ten months of the prior dependency proceeding, Minor was placed with the maternal grandparents and they met and spoke with the Department often, providing numerous opportunities for the inquiry to have taken place.

Mother also contends that, even if the Department inquired as to the maternal grandparents in the prior dependency proceeding, the Department and juvenile court were obligated to inquire again at the commencement of the current dependency proceeding. Section 224.2 provides, "[t]he duty to inquire begins with the initial contact"; the Department "has a duty to inquire" "[i]f a child is placed into the temporary custody of a county welfare

17

department pursuant to Section 306"; and "[a]t the first appearance in court of each party, the court shall ask each participant present in the hearing whether the participant knows or has reason to know that the child is an Indian child."  (§ 224.2, subds. (a)–(c).)  Only two years and a few months elapsed between termination of the prior proceeding and the instant petition, the current proceeding continued under the same case number as the prior proceeding, and the same bench officer presided over both proceedings.  Under these circumstances, we decline to construe section 224.2 to obligate the Department and juvenile court to repeat the recent prior inquiry of the maternal grandparents as to Minor's possible Indian ancestry.  (See *In re K.H.* (2022) 84 Cal.App.5th 566, 603 ["statutes are interpreted to ' "avoid a construction that would produce absurd consequences, which we presume the Legislature did not intend." ' "].)

## DISPOSITION

In case No. A168829, the appeal is dismissed.  In case No. A169488, the order is affirmed.

SIMONS, Acting P.J.


We concur.

BURNS, J.
CHOU, J.




(A168829 / A169488)